BOSLEY *vs.* M'KIM.—June, 1826.

L, the owner of a parcel of ground in the city of *Baltimore,* wishing to dispose of it, caused it to be laid out into lots and alleys, for the benefit of the lots, and a plot of the whole to be made, and afterwards sold the lots at public sale, as located on the plot, which was exhibited at the sale. M became the purchaser of lots Nos. 1 and 13, divided on the plot by a N and S 1½ feet alley, and beginning, each of them, at the upper end of the alley; and B and F, and others, purchased the lots below, which were separated by the same alley, and bounded by it. L afterwards conveyed to M, not only the lots 1 and 13, but that part of the said alley which intervened between them; and M, supposing himself to have title to the soil of that part of the alley itself as well as to his lots,

built upon a part of it. There was some evidence to show that it was understood at the sale that the purchaser of those two lots was also to have the intervening portion of the alley. After M's building had been erected several years B, one of the purchasers of the lower lots, began to question M's right to the alley itself between his two lots, and his right to put his building upon it; and the difference between them terminated in a deed of compromise, by which M, relinquished all right to the use of the alley below his lots to B & F, and they relinquished all their right to M, to the part of the alley between M's lots. M afterwards sold his said lots and building to J, and conveyed them to J, expressly subject to the said deed of compromise between M and B & F. After J's purchase, B prevented his using that part of the alley below his said lots 1 and 13, by obstructions placed in the same. On a bill filed by J to have those obstructions removed, and himself quieted in the enjoyment of this part of the alley, and alleging that the said deed of compromise was obtained from M, by fraud and threats, on the part of B, and in mistake of M's rights, and praying to have that deed set aside so far as it restrained M from the use of said part of the alley—*Held*, 1. That from all the evidence in the cause M was not to be considered as the purchaser at the original sale of the alley intervening between lots 1 & 13.

*Held* 2. That not having so purchased, there was a sufficient consideration for his deed of compromise with B & F.

*Held* 3. That even if M had legal title to the alley between his said lots, by virtue of his conveyance from the original proprietor, yet as J bought from him expressly subject to the said deed of compromise, J was not entitled to the relief he prayed.

*Held* 4. That although the deed of compromise might not operate at law as a transfer, of the right of the parties to it, to the use of the alley, on the ground that that right was a right of way, appendant to the lots, and could not be severed from the lots themselves; yet that in equity it would operate sufficiently to effect the design of the said parties.

*Held* 5. That upon the whole case J had no equity to support his application for the relief prayed by him.

There is no case in which a court of equity ever granted a perpetual injunction to a plaintiff to protect him in the enjoyment of a naked legal right, which he, or those under whom he claims, have stipulated by deed not to exercise—Per *Dorsey* J.

Legal rights are to be asserted by legal means; and in such cases courts of equity never lend their aid where equity and justice do not imperiously demand it. *Ibid.*

Bill dismissed, but *without costs*.

APPEAL from *Baltimore* County Court, sitting as a court of equity. The bill in this case was filed by the appellee for an injunction to prevent the appellant from obstructing a certain alley, and debarring him from the use of it. The bill states, that *Elizabeth Lawson*, since deceased, being entitled to, and

seized in fee simple of and in a parcel of ground, lying and being in the city of *Baltimore* between what are now called *Holliday-street* and *Belvidere* (formerly *North*,) street, caused the same to be divided into lots and alleys, for the bene-. fit thereof, and a plot of the whole to be made, with a view to expose the same to sale, in or about the year 1809, of which division, the plot, or diagram, exhibited, *(marked A,)* is a true representation. That on or about the 1st of December 1809, the said *Elizabeth Lawson*, by her agent *Charles Brown*, caused the said lots, or some of them, to be set up to public auction, the said agent attending the same, together with *Henry W. Rogers*, attorney at law, on the part of the said *Elizabeth*; that at the said sale, which was made and conducted by *Thomas Yates*, an auctioneer of the said city, *Jacob Myers*, became the purchaser of the lot number *one*, and of the lot number *thirteen*, with an understanding, that the portion of the north and south ten feet alley, intervening between the said two lots, should be included in his purchase, and that he should have the same right and title to that as to the lots themselves; as will appear by the deed for the same, to *Myers*. That at the said sale, *James Bosley*, (the appellant,) became the purchaser of the lots number *two*, and number *fifteen*; that *John Small* became the purchaser of lots number *three, four* and *fourteen*; and that *Samuel* and *Walter Farnandis* became the purchasers in common, of the lot number *five*; all of which last mentioned lots, bounded on the said north and south ten feet alley. The bill further charges, that although the said lots had been divided, and the said alleys planned, as shown in *exhibit A*, and had been accordingly laid down in a plot which was produced at the said sale, it was distinctly announced and explained at the sale, that the purchaser of the two southermost lots number *one* and number *thirteen*, would have the advantage of building over the alley, which on the plot interposed between them, and that this advantage was one of the inducements with *Myers* to become the purchaser of both, and enhanced the price of, and multiplied bidders for them. That at the said sale, the auctioneer, or some of the persons present, on the part of Mrs. *Lawson*, in pursuance of the said explanation, connected the said two southermost lots as laid down

on the said plot, and purchased by *Myers*, by continuing the east and west lines with a black-lead pencil, across the said ten feet alley, so as to make one lot of the two southermost lots, and the intermediate portion of the said alley. That the said north and south ten feet alley was designed for the accommoda-tion of the purchasers of the lots bounding thereon, as a way or passage, and as an outlet for rain water, and other similar purposes, through the ground of the said *Elizabeth Lawson*, down to *Jones's Falls*, and that there was no outlet at the south end of the said alley, which was met by the lot of *John Carriere*, as shown in *exhibit A;* that, therefore, the continu-ance of the alley between the lots number *one* and number *thir-teen*, purchased by *Myers*, could be of no importance or value whatsoever, to any of the purchasers of the lots bounding on the other, or lower portion of the alley; and that this conside-ration enabled the auctioneer, and those acting for Mrs. *Law-son* at the sale, to represent and sell, at a better price, the lots number *one* and *thirteen*, and the intermediate part of the pro-jected alley, as one lot, and to one person, without any preju-dice to the purchasers of the other lots, who, moreover, must have known, in the course of the sales, what was so as afore-said announced and explained as an advantage connected with the said upper or southermost lot. That *Bosley*, sometime after the said sale, received from *John Small*, an assignment of his purchases aforesaid; and that on or about the 16th of De-cember 1811, deeds of conveyance were prepared and execut-ed to *Myers*, to *Bosley*, under his own purchases, and also as assignee of *Small*, and to *Samuel* and *Walter Furnandis*, which were duly acknowledged and recorded among the land records of *Baltimore* county. That these deeds were pre-pared by the said *Henry W. Rogers*, who was present when the said sales were made, and knew the extent, nature and terms, of the said several purchases, and acted as agent or at-torney of Mrs. *Lawson;* that the deed to *Myers*, (which is ex-hibited *marked E,*) corresponds precisely with the statement, herein before made, relative to the portion of the north and south ten feet alley, intermediate between the lots number *one* and *thirteen*, which it includes within the metes and bounds expressed in it, as a part of *Myers's* purchase and title; for it

professes to begin for the said purchase on the west side of *Hol-liday-street*, at the distance of 319 feet northerly from the in-tersection of the northwest corner of *East* and *Holliday-streets*, thence to run easterly, parallel with *East-street*, and bind-ing on the north end of *Holliday-street*, 35 feet to *Back-street* or *Holliday-street* united, thence north, binding on *Back-street* or *Holliday-street* united, 31 feet, to lot number *two*, pur-chased by *Bosley*, thence west, parallel with *East-street*, and binding on lot number *two*, running 187 feet to *North-street*, (now *Belvidere-street*,) which crosses the said alley, thence south, binding on *North-street*, (now *Belvidere-street*) 31 feet, thence east with a straight line to the beginning, (which again crosses the said alley,) "with the privilege of an outlet through a ten feet alley *at the back of lot number two;*" so that the whole south end of the projected alley, lying between lots number *one* and *thirteen*, was comprehended in, and passed in full property by the said conveyance, in the same manner, and to the same extent and effect, as the lots themselves, and the whole were conveyed as one lot, described by the above recited outbounds, and the terms in which the privilege of the outlet through the ten feet alley is granted by the said conveyance, are in strict conformity with the aforesaid metes and bounds, given of the ground, intended to be conveyed, since the privi-lege is made to apply only to the alley, as having its first ex-istence on the south, *at the back of lot number two.* That while the metes and bounds of the deed to *Myers*, compre-hended the intervening portion of the ten feet alley, and the description of the privilege of the outlet through the alley cor-responded with the conveyances to *Bosley* and *Samuel* and *Walter Farnandis* excluded the other part of the projected alley, and bounded their several lots upon it, and did not even give in their terms, the privilege of the said alley as an outlet, however the grant of it may be implied from the expressions actually used by way of reference to the alley, as laid out and existing, and as bounding their lots. That *Bosley* afterwards purchased a part, (with a front of seven feet on *Holliday-street*) of the lot, so bought by, and conveyed to, *S.* and *W. Farnandis*, which part is particularly shown in *exhibit A*, and which was conveyed by them to *Bosley*, by deed bearing date

the 31st of July 1812. The bill further states, that very soon after the sales, to wit, in the spring of 1810, *Myers* begun to build a valuable dwelling-house, with extensive back buildings, on the said lot, and completed the same within about a year from its commencement, of which the kitchen covered all but three feet of the said part of the north and south ten feet alley, included as aforesaid within the lines of his purchase and deed, and the said three feet were covered by a continuation of the building for other purposes. That *Bosley* was not only apprised of the commencement and progress of the said buildings, as he lived in *Baltimore*, and could not fail to know it, but constantly saw, and actually witnessed the same, and not only made no objection whatever thereto, but built at the same time a dwelling-house on his adjoining lot, number *two*, which is now standing, and shared in the expense of the party wall between his said house and *Myers's*, and countenanced and concurred in the said acts of *Myers*. That *S. & W. Farnandis*, also knew of the commencement and progress of the said buildings by *Myers*, and did not object thereto, or allege any right to, or interest in, the said part of the said ten feet alley. That *Myers*, being so entitled in law and in equity to the whole of the ground comprehended within the metes and bounds of his said purchase and deed, including the said part of the said projected alley; and having, under the fullest conviction, and in the assertion of such his title, and with the knowledge, and even the concurrence of *Bosley*, and with the knowledge and implied assent of *S.* and *W. Farnandis*, built upon the same, actually resided in the said house with his family, and used and occupied the same, and the other buildings and improvements on the said lot, for three or four years, or more, without any objection being made by *Bosley* or *S. & W. Farnandis*, who were fully acquainted with their own rights, whatever they might be to the covering with his said buildings the said part of the ten feet alley; but that in or about the year 1815, *Bosley*, in his own name, and in those of *S. & W. Farnandis*, for the first time questioned the right of *Myers* so to cover with his buildings the said part of the alley, and began to threaten to disturb him in the occupation thereof, and insisted that he could make him pull down, and take away, such portion of his said buildings or im-

provements as were placed upon the alley, in virtue of a right in himself, or on himself and *S. & W. Farnandis*, to the use of the said part of the said alley; and soon afterwards *Bosley* began to obstruct the communication between the said buildings and lot of *Myers*, and the alley, by a mound or wall, which, however, *Bosley* the same day removed, admitting that he could not lawfully persist in such obstruction; but he, *Bosley*, continued to assert that he could compel *Myers* to open the alley through his said buildings, and alarmed *Myers* with groundless fears for his title to the said part of the said alley, and for his buildings thereon erected; until at length *Myers* was induced by *Bosley*, his conduct and representations, to doubt his own unquestionable rights, and mistake the value of the pretences of *Bosley*, and, being anxious to avoid a law suit, and being somewhat indifferent to the enjoyment of a right of passage along the said alley, and being, moreover, assured by *Bosley*, that the water issuing from his said buildings and lot, through the said alley, should not be stopped, unless it became a nuisance, he consented to a proposition made by *Bosley*, that he, *Myers*, should give up his interest in the said ten feet alley, and in the other ten feet alley, (shewn in *exhibit A*, and running east and west,) to *Bosley* and *S. & W. Farnandis*, in consideration of their securing his title by a release or conveyance to that part of the said alley on which his buildings and improvements stood. Whereupon a deed was prepared to that effect, (to which *Myers* and *Bosley*, and *S. & W. Farnandis*, were parties,) which was acknowledged, and recorded in *Baltimore* county court, and marked *Exhibit F.* That the sole consideration of the release, or surrender or transfer, of the indisputable interest of *Myers*, in the said alley, to *Bosley* and *S. & W. Farnandis*, (as sufficiently appears by the deed itself,) was the reciprocal release or transfer of the pretended right of *Bosley* and *S. & W. Farnandis*, to the said part of the said originally projected alley, built upon as aforesaid, by *Myers*, which right *Myers* was made to apprehend, might be used to the great injury, and even destruction of his valuable buildings, and the great diminution of the value of his lot; whereas the said alleged right, or any right whatever, in *Bosley* and *S. & W. Farnandis*, had no existence, but was a mere

fiction, and, therefore, that the said release or surrender, or transfer, by *Myers*, was without any real consideration, although *Myers* erroneously believed, and was persuaded to believe, that it was otherwise; and moreover, not only was the said surrender, or release or transfer, without consideration, and the result of mistake and misapprehension on the part of *Myers*, of his own rights, and of those of the other parties aforesaid, but that it was obtained by *Bosley* by threats of putting his unfounded claim in execution, and produced by fears on the side of *Myers*, and of menace and management on the side of *Bosley*, resorted to for the purpose of alarming and misleading *Myers*. That the confidence of *Myers* in the above mentioned assurance of *Bosley*, that the water from his buildings and lots should not be stopped unless it produced a nuisance, contributed to influence his mind to agree to the said proposal of *Bosley*, and to become a party to the said deed. The bill also states that the said deed, between the said parties, did not in law pass as a grant from *Myers*, since the interest (as an incorporeal hereditament or however else,) of *Myers* in the said alley, below or to the north of his lot, was *appendant to his interest in the lot itself*, and without a transfer of the lot, to which it was annexed, could only pass to the owners of the soil of the said alley, the representatives of *Elizabeth Lawson*, by a release or surrender; and that if considered as a contract merely, neither *Bosley* nor *S. & W. Farnandis* can derive any right to it *at law*, other than a right of action against *Myers*, (if ever that could be maintained,) and in equity no right of any sort, especially a right to lay rubbish and obstructions upon the said alley in which they could have nothing more than an easement. The bill further states, that in the year 1816 the complainant bought the said house and lot from *Myers* for a very large sum of money, and on the 7th of November, in the said year, received from him conveyance thereof in fee, with the appurtenances, which conveyance was duly acknowledged and recorded That when he so bought the said house and lot, he was told by *Myers*, that the water could not be stopped from flowing through the said alley, by *Bosley* or *S. & W. Farnandis*, unless it should become a nuisance, and he received the said house and lot upon that confidence, which he

found to be encouraged by the fact, that during the whole occu-
pation of *Myers*, which he thinks continued until some time in
the year 1817, the water was never prevented from flowing
from the said house and lot through the said alley. That for
sometime after his said purchase of the said house and lot, (of
which he took immediate possession, and in which he has ever
since resided with his family,) he never heard an idea intimat-
ed by *Bosley*, or any other person, that the flowing of the said
water could be stopped; but that in or about the spring of the
year 1821, *Bosley* mentioned to the complainant that he had
a right to the said alley by a contract with *Myers*, or some-
thing to that effect, to which the complainant replied, that,
at any rate, he could not obstruct or prevent the flowing
of the water through it, from the complainant's lot, if it did
not become a nuisance, or to that effect; and *Bosley* did not
then press the subject any farther, and did not afterwards do
so until very lately, when he began to insist upon his right
wholly to prevent the flowing of the said water along the
said alley; and, upon the complainant's refusing to acknow-
ledge such right, he proceeded, in violation of his aforesaid
assurance to *Myers*, upon which the complainant, as well as
*Myers*, had relied, and without any colour of law or justice,
to erect obstructions across the said alley, in contact with the
wall of the complainant's said house, where the water issues
into the said alley, which the complainant caused to be peacea-
bly removed; but *Bosley*, within a few days past, to wit, on
the, &c. still persisting in his determination wholly to prevent
the flowing of the water from the complainant's said house and
lot, through the said alley, hath made another obstruction to
the same, covering the head of the said alley, in its entire
breadth, with stones, and sand, and rubbish, strewed in and
extended in length down the said alley of about twenty or
thirty feet, and in thickness or height about two feet, against
and touching the said wall of the complainant's house, and
having no other object, and answering no other purpose, but
to produce the said obstruction, and being of no, or inconsi-
derable value in themselves, and of as much value in them-
selves, if removed from their present position, as there; which
obstruction *Bosley* caused to be made by a great number of

sailors, and others, who, with *Bosley*, appeared resolved to accomplish their said work forcibly if any attempt should be made to interfere with them; and all this has been done by *Bosley*, without any authority from *S. & W. Farnandis*, or *James Biscoe*, who purchased from them, and now resides in a house built on the aforesaid lot of *S. & W. Farnandis*, or from any other person, he, *Bosley*, claiming to himself a right to use the said part of the said alley (at the back of his house and lot, number *two*, herein before mentioned,) as if he had full property in the soil thereof, and not a mere right of passage over it, and of use to it as an alley, or as if he only had that right of passage and use, or in the assertion of such a right, could do an act, which, as far as it goes, destroys all passage, and amounts, as the complainant is advised, to a trespass upon the owners of the soil of the alley, and an usurpation upon the other claimants of the same right in the same alley. The bill further states, that the flowing of the waters from the complainant's building and lot has been so far from producing any nuisance in the said alley, that it has produced no material inconvenience to any person; that the water has lately flowed, as it did for years before, consisting almost wholly of rain water, and free from impurities in a far greater degree than is usual in such cases. That, independently of the water which has flowed from the complainant's said house and lot, until interrupted as aforesaid, the water from the house and lot of *Bosley*, and from the other lots upon the said alley, has always flowed, and still does flow, through the same, to all which the addition of the water from the complainant's lot, could be of no great importance, or make a nuisance where there was none before, and that even before the said lots were sold, and built upon, the ground of the said alley, and the contiguous ground was, as the complainant believes, the conduit of the water from his lot to the Falls. That the obstruction of the course of the said water, by *Bosley*, is, and will continue to be, a serious mischief to the complainant, who has no other outlet for the said water, and has already been compelled, by the said obstruction, to sink wells in the yard to receive the rain water, which otherwise would flow into his cellars, and be greatly injurious to his property, and the health

of his family, and from those wells, it would be necessary, if much water should accumulate in them, to convey it by buckets, or some such inconvenient mode, into the street, and through his house; and if the accumulation should be rapid, even that would be ineffectual. That before the making of the last mentioned obstruction, he had offered to *Bosley* to refer the dispute, which his former attempt to prevent the flowing of the water from the complainant's house and lot through the said alley had produced between them, to the decision of any three intelligent persons, either lawyers, or others, and the complainant was induced to suppose that this overture would be accepted; but it soon appeared that *Bosley* was bent upon asserting his fancied right, and would listen to no proposals having friendly adjustment for their object. That the complainant endeavoured, at the time of the making of the said last mentioned obstruction, to prevail upon *Bosley* to desist therefrom, and well hoped that he would have done so. But that he persists in his determination to obstruct the flowing of the said water as aforesaid, and threatens to continue to do so, although he has no right whatever to lay accumulations of stones, and gravel, and sand, upon the surface of the said alley, or other rubbish, in which he has not any property whatever, nor even a right of way but by an indulgent interpretation of his title papers, if indeed he has any such right, which the complainant does not admit. *Prayer*, that *Bosley*, *S.* and *W. Farnandis*, and *B*iscoe, may true and perfect answers make to the several matters and things in this bill of complaint contained, and that B*osley*, his agents and servants, may be enjoined to remove the said obstruction, or suffer the complainant to cause it to be removed, and to forbear any attempt to renew the same, or to make any other obstruction to the flowing of the said water as aforesaid, until the further order of this court; and that the complainant may, by the decree of this court, be quieted in the enjoyment of the said alley, as alienee and assignee of *Myers*, and owner of the house and lot to which the use and privilege thereof are appendant, and his title thereto maintained; and that he may have such other and further relief, as the nature of his case, and equity and good conscience require.

*Exhibit* A. Is a plot by which Mrs. *Lawson* sold the property.

*Exhibits* B, C, D. The depositions of witnesses as to the manner and terms of sale to *Myers.*

*Exhibit* E. The deed from *E. Lawson* to *Myers,* dated the 16th of December 1811, conveying to him and his heirs, "all that piece or parcel of ground situate in the city of *Baltimore,* beginning on the west side of *Holliday-street,* at the distance of 319 feet northerly from the intersection of the N W corner of *East* and *Holliday-streets,* thence running easterly, parallel with *East-street,* and binding on the north end of *Holliday-street,* 35 feet to B*ack-street* or *Holliday-street* united, thence N binding on B*ack-street* or *Holliday-street* united, 31 feet to lot No. 2, purchased by Mr. *James* B*osley,* thence W parallel with *East-street,* and binding on lot No. 2, running 187 feet to *North-street,* thence S binding on *North-street* 31 feet, thence E with a straight line to the beginning, with the privilege of an outlet through a ten feet alley at the back of lot No. 2."

*Exhibit* F. The deed between B*osley, S.* & *W. Farnandis* and *Myers,* dated the 1st of July 1815, reciting the deed from Mrs. *Lawson* to M*yers;* her deeds to B*osley,* and her deed to *S.* & *W. Farnandis,* and the deed from *S.* & *W. Farnandis* to B*osley,* for part of the lot conveyed to them by Mrs. *Lawson;* also referring to a plot exhibited at the sale of the lots by Mrs. *Lawson,* delineating two lanes or alleys each of the width

of ten feet, the one of them extending nearly N and S parallel with *Holliday* and *North-streets,* and at the distance of 100 feet easterly from the latter, passing through the whole extent of Mrs. *Lawson's* ground, to wit, from the northermost line of the ground conveyed to *S. & W. Farnandis,* to the southern extremity or limits of, and passing through the ground conveyed to *Myers;* and the other one of the said alleys extending from *North street* at right angles, easterly, and between the two parcels of ground fronting on the E side of *North-street,* conveyed to Bosley, to intersect the alley running parallel with *Holliday* and *North-streets,* which said lanes or alleys were, at the time of the said sale, declared to be for the use and benefit of the purchasers of the ground, then offered for sale, and the remaining ground of Mrs. *Lawson.* Also reciting, that Myers had improved and built upon that portion of the alley extending from N to S, to wit, the S end of said alley, and which is comprised in the description set forth in the deed to him; "and in consideration of his agreeing to relinquish all right to the use of the residue of that alley, and the whole of the alley running from *North-street* as aforesaid, they the said Bosley and *Samuel,* and *Walter Farnandis,* have severally and respectively agreed to release to the said *Myers,* all their right and title to that portion of the said alley so as aforesaid improved and built upon by him." The said Bosley and *S. & W. Farnandis* did thereby, in consideration of the premises, and in consideration of one dollar a piece to them paid by Myers, bargain, sell, surrender, and forever release, to Myers, his heirs and assigns, "all the right, title, interest and claim whatever, of the said Bosley and *S.* and *W. Farnandis,* of, in and unto, all that portion of the aforementioned alley, comprised within the limits of the conveyance to the said Myers, and which hath been so as aforesaid improved and built upon by him; to have and to hold," &c. And the said Myers did thereby, in consideration of the premises, and of one dollar, &c. bargain, sell, surrender, and forever release, unto the said Bosley and *S.* and *W. Farnandis,* their heirs and assigns, "all the right, title, claim and interest whatsoever, of the said Myers of, in and unto, the two several alleys before mentioned, and the use of them respectively, except that portion of

the one of them so as aforesaid improved and built upon by him. To have and to hold," &c. The *injunction* prayed by the bill was granted accordingly.

The *answer* of the appellant, (one of the defendants below,) denies the plot exhibited by the appellee to be correct, as the alley does not run in it through the whole length of the ranges of lots. He denies the understanding, that Myers should take in the alley in his ground. He refers to the depositions of *Young* and *Myers*, accompanying his answer, to show that there was no such understanding. He asserts that the lots of Myers sold at a higher price than others, not on account of taking in the alley, but because of their larger front on *Holliday-street*, and being higher and better ground for building—some of the other lots requiring piling in order to build. He believes that the alley between Myers's lots would prove a convenience in various ways. He avers that the conveyance to *Myers*, including the alley, was a fraud on the purchasers of the other lots; and he refers to Mrs. *Lawson's* bond of conveyance to Myers, given before her deed to him, in which the part of the alley is not agreed to be conveyed. He insists on his right of way by Mrs. *Lawson's* deeds to him. He denies that he suffered Myers to build across the alley, except on condition of his leaving an opening underneath that might be closed with gates. That Myers built over the alley, and the discharge from his lots became offensive; that Myers then showed for the first time, to the appellant, Mrs. *Lawson's* deed, which surprised him; that Myers then, without being alarmed or threatened by the appellant, made the exchange of his right of way for the secure right of building over the alley. He denies that he agreed to let the water run from Myers's property through the alley, longer than the time necessary for Myers to raise the yard of his house, so as to let it off into *Holliday-street;* and provided too, that it did not become a nuisance, in which event it was to be shut up at the appellant's discretion. That the appellee has a better outlet for the water through B*elvidere-street*, and that the appellee admitted that fact before filing the bill. That the filth, &c. in the alley from the appellee's house, became offensive to the appellant's tenants. That they complained, and a fter sending

letters to the appellee, &c. the appellant attempted to stop his use of the alley. That the water, &c was not discharged in the appellee's time as it was while *Myers* was owner. That *Myers* had it to flow through a gate, by which means the outlet, &c. could be cleaned; but it was not so with the appellee's arrangements. That in the fall of 1821 the appellee built up the whole width of the alley, and had no outlet, except through a hole in the wall, and requested the appellant to permit the water to run down the alley until he could lay pipes to carry it into *Holliday-street*. That when the appellee's work was done, the appellant requested him to stop the hole; but he would not—thence the obstructions by the appellant, &c. He avers that the flowing of the water, &c. from the appellee's property, was a great nuisance.

Among the several exhibits of the appellant, accompanying his answer, is the deed from *Myers* to the appellee, dated the 7th of November 1816, reciting the deed from Mrs. *Lawson* to *Myers;* and in consideration of $18,000, *Myers* conveyed to *M'Kim,* (the appellee,) and his heirs, all that piece or parcel of ground which was conveyed by Mrs. *Lawson* to *Myers,* by the said recited deed; "subject, however, to a contract between *James Bosley,* and *Samuel* and *Walter Farnandis,* and the said *Myers,* dated the 1st of July 1815. To have and to hold," &c. "subject as aforesaid to the contract respecting said alley or outlet," &c.

The *answer* of *James Biscoe,* (one other of the defendants,) a purchaser from *S.* and *W. Farnandis,* is not material, he having no knowledge of the facts.

The *answer* of *S.* and *W. Farnandis,* (other defendants.) They deny the correctness of the plot exhibited by the appellee. They assert that the alley in the true plan run through the whole property. They deny that there was any understanding as to taking in the alley. They state, as *Bosley* does, why *Myers's* lots sold highest. They deny that the deed with *Myers* as to the alley, &c. was obtained by threats, &c. but that it was executed by him deliberately, and with full knowledge. They deny the pencil marks on the plot, &c.

The motion to dissolve the injunction was overruled by the county court, and the injunction continued. Testimony was

taken under an agreement of the parties; and a *pro forma* decree passed by the county court making the injunction perpetual. From that decree *Bosley*, one of the defendants below, appealed to this court.

The cause was argued at December term 1825, before Bu-chanan, Ch. J. and Earle, Stephen, Archer, and Dorsey, J.

*Speed*, for the Appellant, contended, 1. That the deed between *Bosley* and *Farnandis* and *Myers*, by which *Myers* renounced his right to the alley, binds *M'Kim*, and bars his claim to the use of the alley.

2. That the said deed was fairly obtained from *Myers*, and for an adequate consideration.

3. That *M'Kim* cannot impeach the said deed for fraud or want of consideration.

4. That the court has no jurisdiction in this case.

A compromise of a doubtful right, where no advantage is taken, is a valid consideration. 1 *Pow. on Cont.* 363. *Cory vs. Cory*, 1 *Ves.* 19. *Cann vs. Cann*, 1 *P. Wms.* 724. *Stapilton vs. Stapilton*, 1 *Atk.* 10. *Taylour vs. Rochford*, 2 *Ves.* 284. *Gibbons vs. Caunt*, 4 *Ves.* 849. *Pullen vs. Ready*, 2 *Atk.* 592. A right of way appendant, raised by *operation of law*, may be granted; though if raised by deed it cannot. 2 *Blk. Com.* 35. The covenants in the deed of compromise are sufficient to bind *Myers*, and all claiming under him, and among others, purchasers for valuable consideration with notice, and *M'Kim* had notice. *Finch vs. Earl of Winchelsea*, 1 *P. Wms.* 282. *Freemoult vs. Dedire*, *Ib.* 429. Equity will prevent a breach of a covenant. 1 *Madd. Chan.* 159, 162. 1 *Fonbl.* 345, 346. The privy cannot deny the force of the covenant. *Taylor vs. Stibbart*, 2 *Ves. jr.* 437. A grant will be construed a covenant. *Curtis vs. Perry*, 6 *Ves.* 745. The deed operated as an agreement in the recitals. The agreement is evidenced by the deed, and binds the parties. 1 *Pow. on Cont.* 313, to 316. *Cannell vs. Buckle*, 2 *P. Wms.* 243. The deed operates as an estoppel on the privies of Myers, both as respects its validity and its effect. *Litt. s.* 58. *Co. Litt.* 352. *Rawlins'* case, 4 *Coke*, 53, 56. *Ferrer's* case, 6 *Coke*, 7. *Blake's* case, *Ib.* 44. *Winchester's* case, 3 *Coke*, 3. The

court has no jurisdiction of the case—a bill will not lie in a case like this.   1 *Madd. Chan.* 171, 172.   1 *Harr. Chan.* 124, 125.   *Lord Tenham vs. Herbert*, 2 *Atk.* 483.   *Witchurck vs. Hide, Ib.* 391.   *Cowper vs. Clerk*, 3 *P. Wms.* 156.   *Weller vs. Smeaton*, 1 *Bro. Ch. Rep.* 573.

*Mayer*, on the same side.   The appellee is the complainant, and comes into court claiming equity—To set aside a solemn conveyance entered into by his grantor, of which he had full knowledge.   An alley means a right of way.   The condition of sale was, that the alley was to go through the whole extent of Mrs. *Lawson's* property then offered for sale.   No verbal declarations at a sale can control the printed conditions of sale. *Sugd.* 22, 23.   *Powell vs. Edmunds*, 12 *East*, 6.   The bill alleges that the alley is the natural course of the water.   The natural course of the water only existed while the ground remained in its natural state.   The owner of the soil may change the course of the water, or prevent it from flowing at all, by filling up the water course.   Parol evidence is admissible to prove, by the penman of the deed, that something was omitted or inserted by mistake or by fraud.   1 *Pow. on Cont.* 432. Mistake in law is no ground for *assumpsit;* but a mistake in fact is.   The deed of compromise put an end to all rights of the parties.   This is not a right of way.   *Co. Litt.* 120.   It is only appertenant and grantable.   *Bro. Ab.* tit. *Grant,* pl, 130.   2 *Roll. Ab.* 46.   Whether grantable or not, it is not said it may not be severed.   A man may exclude himself from the enjoyment of a right of way.   A right of way is not considered an interest, but an easement, and is not similar to a right of common.   *Anon.* 3 *Salk.* 40.   *Godley vs. Frith, Yelv.* 159. *Liford's* case, 11 *Coke*, 47.   A highway may be granted.   *Bro. Ab.* tit. *Common,* pl. 27, 28.   It is contended that the deed vests no right in B*osley*, but it is to exclude M*yers* from the use of the easement—to bar him of the community of benefit. *Jacobson vs. Fountain*, 2 *Johns. Rep.* 176, Per *Thompson*, J. The party might, though he could not, grant the right, covenant to bar himself from the benefit of it, or not to exercise it. Though the right to exercise a trade is not grantable, yet the party may covenant not to exercise it.   2 *Bac. Ab.* tit. *Cov*.

*nant*, (B) 65. A *chose in action* is not assignable, yet the assignment of it is a covenant. *Deering vs. Farrington*, 1 *Mod.* 113. Issue in tail cannot release his right to disseissor, but he may bind himself by warranty. *Litt. s.* 446. *Mason vs. Muncaster*, 9 *Wheat.* 445. *Eden on Injn.* 223. *Co. Litt.* 223, b. The appellant need not rely on the deed of compromise as a grant, but as a covenant not to exercise a right to which M'*Kim* is bound, coming in as he does, under the covenantor. It operates as covenant to stand seized to uses. *Rigden vs. Vallier*, 2 *Ves.* 255. *Thompson vs. Attfield*, 1 *Vern.* 40. *Crossing vs. Sudamore*, 1 *Vent.* 137. *Smith vs. Packhurst*, 3 *Atk.* 135. *Bagshaw vs. Spencer*, 2 *Atk.* 570. *Mosley vs. Mosley*, 5 *Ves. jr.* 248. The word *grant*, even at common law, amounts to a covenant. *Pomfret vs. Ricroff*, 1 *Saund.* 321, 322. Yielding and paying rent amounts to a covenant. *Bac. Ab.* tit. *Covenant*, (B) 65. Bargain and sale is a covenant to convey and to do all it purports to do. 2 *Fonbl.* 46. *Meataer vs. Gillespie*, 11 *Ves.* 625. Bargain and sale, though not enrolled, may be effectuated in chancery as a covenant. *Williams vs.* Mayor, &c. *of Annapolis*, 6 *Harr. & Johns.* 529. The words in the deed of compromise import a covenant; but if they do not, yet there is enough in the recital in the deed to exclude *Myers* from the right of way. The covenant in the deed, at all events, compelled *Myers* to relinquish the right of way to Mrs. *Lawson*. Before complainant can claim equity of the defendant, he must do equity. The covenant must be fulfilled. The deed from *Myers* to M'*Kim*, bound the latter to release to Mrs. *Lawson* the right of way, if it could not be done in any other mode. The bargain for the property, and directions to the writer of the deed, are to be considered as a part of the deed. A recital of this kind is a covenant. *Hollis vs. Carr*, 2 *Freem.* 3. S. C. 2 *Mod.* 89, 91. This case is sanctioned in *Saltoun vs. Houstoun*, 1 *Bingham*, 433, (8 *Serg. & Lowb.* 398. *)* *Severn vs. Clark*, 2 *Leon.* 122. *Graves vs. White*, 2 *Freem.* 57. If it be said to be merely a personal covenant so as to bind *Myers* and not his assignee, the answer is, if any interest was vested in *Bosley* it must bind the assignee. The covenant must embrace not only *Myers*, but his assigns. There is a covenant in the deed that attends the land, (2 *Bac. Ab.* tit. *Covenant*, 65,)

which binds the assigns, though they be not named.   If not at common law, it does in equity.  1 *Fonbl.* 253, 354, 355.  M‘*Kim* has no right to claim the advantage of his having his building over the alley, unless he relinquishes his right to the benefits of the right of way to the alley from his lot.  Equity will not permit him to enjoy the one, without his relinquishing the other.  It will be said that the deed to M‘*Kim* refers to the deed of compromise, according to its legal operation.  It does more, it shows that he is only to enjoy under his deed on the sole condition of respecting the deed of compromise.  The deed of compromise is an indenture, and will operate by way of estoppel.  Equity follows the law no further than to lead to an honest and virtuous decision.  To do that it will enforce the doctrine of estoppel.  In a case of private nuisance, such as this is, chancery has no jurisdiction to grant more than a temporary injunction to abide a suit at law.  So when the title is at all questioned.  *Van Bergen vs. Van Bergen,* 2 *Johns. Chan. Rep.* 272.  *Gardner vs. Village of Newburgh, Ib.* 164.  *Van Bergen vs. Van Bergen,* 3 *Johns. Chan. Rep.* 282.  *Corning vs. Lowerre,* 6 *Johns. Chan. Rep.* 439.  *Storm vs. Mann,* 4 *Johns. Chan. Rep.* 21.  *Pillsworth vs. Hopton,* 6 *Ves.* 51.  *Davis vs. Leo, Ib.* 784.  *Hanson vs. Gardner,* 7 *Ves.* 308.  *Stevens vs. Beekman,* 1 *Johns. Ch. Rep.* 318.  *Cooper's Plead.* 159.  *Birch vs. Holt,* 3 *Atk.* 726.

*R. Johnson,* on the same side, referred (on the question of jurisdiction,) to *Norway vs. Rowe,* 19 *Ves.* 147; and as to the effect of the recital in the deed of compromise, to *The Parishes of Caister and Eccles,* 1 *Ld. Raym.* 683.

*Marriott,* for the Appellee.   The deed of compromise was founded on mistake and fraud, and parol evidence is admissible to prove the mistake or fraud.   This case is to be considered in the same manner as if the original parties were now before the court—as if the contest was between M‘*Kim* and M*y*ers.  *Ardglass vs. Muschamp,* 1 *Vern.* 237.  *Englefield vs. Englefield, Ibid* 443.  *Chesterfield vs. Janssen,* 2 *Ves.* 152, 155, 157.  *S. C.* 1 *Atk.* 354.  *Hobart vs. Galley,* 2 *Atk.* 34; and *Hawse vs. Wyatt,* 3 Bro. *Chan. Rep.* 156.  The deed of compromise is wholly void both at law and in equity.  The sole consideration

of it, as regards *Myers*, was the reciprocal release of the *pretended* right to the alley. Cases in which instruments of this sort have been set aside on the ground of fraud or mistake, take. *Masan vs. Armstrong*, 13 *Ves*. 25. *Gee vs. Spencer*, 18 *Vin. Ab*. 370, cites 1 *Vern*. 32. *Lucas vs. Adams, Ib. Broderick vs. Broderick*, 1 *P. Wms*. 239. *Murray vs. Palmer*, 2 *Sch. & Lef*. 474. *Evans vs. Llewellen*, 2 *Bro. C. Rep*. 150. 2 *Pow. on Cont*. 196. *Lansdown vs. Lansdown, Mosely*, 364. This last case, sanctioned in *Hunt vs. Rousmanier*, 8 *Wheat*. 214; and in *Lammot vs. Bowly*, 6 *Harr. & Johns*. 500. 2 *Pow. on Cont*. 200. *Whorewood vs. Simpson*, 2 *Vern*. 185. In *Lammott vs. Bowly*, 6 *Harr. & Johns*. 500, a party contracting under a clear mistake of his legal rights will be relieved in equity. Fraud may be inferred from facts and circumstances, &c. *Watkins vs. Stockett, Ib.* 435. A written agreement rectified on proof of fraud or mistake, &c. *Wesley vs. Thomas, Ib.* 24. By the agreement between *Bosley* and *Myers*, the former released his right, if any he had, to the alley, to the latter, by parol agreement, before the deed from *Lawson* te *Myers*, for a valid consideration. The answer admits the agreement. It is executed, and will be established; so decided in *Jones vs. Slubey*, 5 *Harr. & Johns*. 372. Suppose the deed of compromise legally and fairly executed, what is its legal effect and operation? It is said it will operate as a grant—as a release—as an extinguishment. That it created a covenant on the part of *Myers*. There are no words in the deed constituting a covenant. It was intended, if at all, as a grant or release. A deed intended to operate in a particular manner, if it fail so to operate, cannot operate in any other way. *Shep. Touch*. 82. This deed was intended to be effective as a grant or release, and, therefore, cannot operate as a covenant to stand seized. *Myers* had no right to grant the right of way; and if his deed was legally executed, it did not pass the right to *Bosley*. He could only release to Mrs. *Lawson*. As to the different kinds of rights of ways—See 1 *Thomas's Coke Litt*. 234, *(note* D.) This is the case of a way appendant to an estate. Can such a way be granted? The right of *Myers* to use the alley was appendant to his use of lots No. 1 and 13. He cited *Fitz. Ab*. tit. *Grant*, 47, pl. 38. *Bro. Ab.*

tit. *Grant*, pl. 130. *Nevil's* case, 1 *Plow.* 381. *Shep. Touch.* 240. 14 *Vin. Ab.* tit. *Grant*, (F) 45. To show that the right was not extinguished, he cited 2 *Coke Litt. (Thomas's,)* 372, *(note* R.) *Ib.* 557, *(note* K.) 11 *Vin. Ab.* tit. *Extinguishment*, (C) 449. It could not be extinguished without the consent of Mrs. *Lawson*, and of all others entitled to the benefit of the right of way. But it is said that as *Bosley* and *Farnandis* had a right of way in the same alley, they were capable of taking a release from Myers. They had, however, no right in the soil, but only title to the way in common with other holders of the lots on the alley. The civil law agrees with the common law in this particular. 1 *Domat Civil Law*, 196. Definition of a service, *Ibid* 199. Services being annexed to lands, and not to persons, cannot pass unless the land passes also. *Ibid* 204. The service ceases on the master of the land becoming the owner of both.

*Wirt*, (Attorney-General of *U. S.)* on the same side. The injunction in this case is against the obstruction of the passage of the water from the house and lot of *M'Kim*, through the common alley left for the use of all the holders. How does *Bosley* claim the right to create this obstruction? He says, under the deed of 1815, the deed of compromise. That deed is void.

1. It is void because it was obtained under circumstances which render it so. Look at the posture of the parties, and of their relative rights, when the deed was entered into. What were the rights acquired at the sale? He here went into an examination of the evidence, to show that it was understood at the sale that the purchaser of lots 1 and 13 was to have the intervening alley itself. Though Myers may not have heard the terms of sale, he could take advantage of them. The bond of conveyance to Myers shows that he acquired higher and different rights from those of the other purchasers. What rights did *Bosley* acquire to the alley? He acquired none. It was an outlet and way, and was so represented at the time of the sale. But suppose *Bosley* acquired a right to the alley at the sale, and Myers did not—How stands the contract when Myers built his house? There was then a parol agreement be-

tween *Myers* and *Bosley*, that *Myers* might build on the alley, and that agreement was executed. *Bosley's* answer admits the agreement. *Fowkes vs. Joyce,* 2 *Vern.* 129. But it is said that this parol agreement did not affect *Farnandis.* He stood by and saw the building going on, and made no objection to it. He is, therefore, to be presumed to have assented to it. 1 *Madd. Chan.* 263, 264, (and *note.)* After this the right of *Myers* was complete. *Bosley's* rights were gone by his consent. Five years afterwards *Bosley* complained, and walled up the alley— admitted he had no right to do so, but said that if *Myers* claimed a right to that part of it below his house, that those below had right to the alley above, and perhaps a part of *Myers's* house must come down. *Bosley* proposed an arrangement, which *Myers* agreed to, doubting his right to the alley, and not willing to enter into a law suit. Is an agreement entered into under such circumstances to be enforced or respected? We have seen what were *Myers's* rights—moral coercion by one, and mistake by the other. No consideration for the agreement. There is no reciprocity in the deed of compromise. *Bosley* and *Farnandis* only pretend to grant the soil. *Myers* conveys the *use* to the alley. Will the deed be respected as a deed of compromise of doubtful rights? If of rights, of which the party did not know, it is not a valid deed. *Cann vs. Cann,* 1 *P. Wms.* 724. In *Lammott vs. Bowly,* 6 *Harr.* & *Johns.* 500, it was decided that ignorance of legal rights will not preclude the party from recovering against an agreement entered into by him under such ignorance.

Can M'*Kim* make the objection to the validity of the deed of compromise if it be void in law, he having purchased with a knowledge of the deed? He purchased subject to that deed; and if the deed was void, it cannot affect him, and he can object to it. The validity of the deed must depend upon the deed itself, and cannot be aided by M'*Kim's* knowledge of its existence. Suppose a purchase made with a knowledge of mortgages, some of which were obtained by fraud, usury, &c. can not the purchaser object to their validity? M'*Kim* was placed in *Myers's* situation, and if *Myers* could object, so may M'*Kim*. But it is said that this deed was subsequently affirmed by the deed from *Myers* to M'*Kim,* so as to render the first valid.

This, however, is not so, for confirmation upon confirmation will not aid such a deed.  *Ardglass vs. Muschamp*, already cited, is full to that point.   *Rook vs. O'Brien*, 1 *Ball & Beatty*, 357, was a case of ratification upon ratification, and yet 30 years afterwards the deed, so ratified, was successfully impeached.

2. The *second* objection to this deed is, that at law it is void. Its mere legal operation is on a right of way on a particular piece of land.   Is such a right the subject of a conveyance? A right of way appendant to land is an incorporeal hereditament.   It does not vest in the proprietor—It stands connected with the land, and cannot be severed at all from the soil to which it belongs.   A right of way appendant, connected with land, cannot be conveyed or granted, or severed from the land. This is the rule of both the common and the civil law.   It may be extinguished by a deed to Mrs. *Lawson*, but to no one else. It was extinguished by her deed to *Myers*.   One tenant in common cannot release to another.   2 *Thomas's Coke Litt.* 551, *(note* a.)   A party is never estopped from denying the legal existence of his deed.   A deed of bargain and sale not recorded, may operate as a covenant, by reason of the payment of money.   The recital in the deed of compromise is to relinquish that to which he had no right, and he goes on so to relinquish in the deed itself, which is a nullity.   It is therefore, not a recital which will amount to a covenant.   If it is a covenant, it binds *Myers* personally; for it does not profess to bind his heirs and assigns.   The deed conveys nothing to him from the other parties to it, for they had nothing to convey.

3. Does the deed of compromise convey the subject?   Suppose it did, what was *Bosley's* remedy?   Not to put up the wall he erected, but to institute his action to recover damages. But the instrument in no part of it acts upon the passage of the water in its natural course, but upon a right of passage of man, horse, &c. through the outlet.   The deed professes to convey mutual rights.   No right of passage for the water up the alley existed in fact, because none ever went or could go that way. They then could not convey that right.   But the water went the other way, and this it is said, *Myers* conveyed.   The right of passage of water is natural or conventional.   Rain water is to

flow in its natural course, and cannot be obstructed. There is no such thing as a man's conveying the right of water to pass over the grounds of his neighbour. The deed will not be construed so as to control the laws of nature.

4. Admitting all the above grounds to be against us, still the parol contract by *Bosley*, that the water might pass until it should become a *nuisance*, is to be respected. Under that agreement it was used for 5 years by *Myers*. M'*Kim* succeeded to *Myers's* rights. Is the water that now passes a nuisance? Nothing passes but rain water—Is that a nuisance? It must be established as a nuisance before the right to its passage can be prohibited. The water, &c. from the kitchen, passes in another way. If a nuisance, the corporation could interfere and prohibit it. The rain water passing through would cleanse the lower part, into which the washings of the stables and offal of other kitchens collect.

As to the point of jurisdiction. It has not been stated whether the jurisdiction is denied to award the injunction, or to perpetuate it. The decree was *pro forma*, by consent, and there is nothing to prevent this court from acting on the case. No objection was taken below to the jurisdiction. If the court could award the injunction, and send an issue to a court at law afterwards for trial, their not doing so cannot be complained of by either party, because they were prevented from doing so by the *pro forma* decree. The decree is to vacate a deed obtained by fraud, and until that was done, there could be no case at law. A court of law may in some cases examine into fraud; but if it can, so may equity more fully. There is no case showing that a court of equity cannot stop a nuisance. This is an obstruction which would be prejudicial to *M'Kim's* property, and the health of his family, or run him to considerable expense before the question could be tried at law. Where a court of equity has refused to interfere, it has been where the party complaining has acquiesced for years; or the trespass has been done and passed, and the object is only to prevent a repetition of it. *Van Bergen vs. Van Bergen,* 2 *Johns. Chan. Rep.* 272. S. C. 3 *Johns. Chan. Rep.* 282. *Corning vs. Lowerre,* 6 *Johns. Chan. Rep.* 439. *Storm vs. Mann,* 4 *Johns. Chan. Rep.* 21. *Hanson vs. Gardiner,* 7 *Ves.*

308. *Stevens vs.* Beekman, 1 *Johns. Chan. Rep.* 318. This last was a mere ordinary case of trespass.

*R. Johnson,* in reply.  1. Upon the question of jurisdic- tion.  Whether the court had jurisdiction to issue the injunc- tion, is not the question; but whether an issue ought not to have been sent to a court of law to be tried; and whether a perpetual injunction ought to have been decreed before such an issue was tried at law?

[BUCHANAN, Ch. J.  This court think the court below were not precluded from going on to perpetuate the injunction, or to dissolve it, without sending an , issue to a court of law.]

This being the opinion of the court, the next question is, whether the injunction ought to have been perpetuated, under the circumstances of this case, admitting that there was no ne- cessity to send an issue to be tried at law?  The fraud charged in the bill gave jurisdiction; but though it is stated that the deed of 1815 was obtained by fraud, yet the court were not asked by the bill to set aside that deed.  So far as that deed conferred rights on M'*Kim,* he had no objection to its standing as valid.  The nuisance charged too, was stated to be of an irreparable injury.  The answer denies that the nuisance is irreparable.  There is no proof that it is of that character.  It is in proof that pipes laid in the cellar conduct the water from the kitchen, (which is on a level with the yard,) into *Holli- day-street.*  If that is the case why cannot the rain be con- ducted the same way?  All the equity in the bill is denied in the answer, and so is the irreparable injury, and there is no proof contradicting, in these particulars, the answer.  That being the case, what are the authorities on the subject *Van Bergen vs. Van* Bergen, 3 *Johns. Chan. Rep.* 282.  The right interfered with must be a long previous *right*—not a *permis- sion*  It must be a strong case of pressing necessity, or es- tablished at law, to induce equity to interfere by in- junction.  *Brown's* case, 2 *Ves.* 414.  The right must be first established by a trial at law.  *Storm vs.* Mann, 4 *Johns. Chan. Rep.* 21.  Where the title is disputed, an injunction will not be granted to stay waste.  *Gardner vs. Village of Newburch,* 2 *Johns. Chan. Rep.* 165.  *Attorney General vs.*

*Utica Insurance Company, Ibid* 379. *Reid vs. Gifford,* 6 *Johns. Chan. Rep.* 19. *Norway vs. Rowe,* 19 *Ves.* 147. There can be no injunction for waste where the title is disputed by the answer. *Eden on Injn.* 168. Another ground, stated in the bill, for the exercise of this summary power by the court, is that it will prevent the multiplicity of suits. *Cooper's Plead.* 159, and the cases there cited. These cases show, that a perpetual injunction ought not to have been decreed.

2. As to the effect of the deed of 1815. It is said that that deed was obtained by fraud or mistake. In the first place there is no proof that *Myers* purchased the intervening alley between 1 and 13. If the alley was sold so as to consolidate lots No. 1 and 13, why not also consolidate No. 2 and 14, and all the rest of the lots?

3. It is said a right of way appendant cannot be conveyed in gross. This is not denied. Here it has not been done. The conveyance here is not to a stranger. The use of the alley was given to all the holders of lots on the alley. *Bosley* does not hold a right of way in gross, in the alley, under the deed from *Myers* in 1815. Where persons have a right of way jointly, there is no authority to show that one of them cannot transfer his right to the others. Such a transfer is only an enlargement of the right of way in the rest. But it is not a right of way strictly speaking, it is an easement. *Godley vs. Frith, Yelv.* 159. *Anon.* 3 *Salk.* 40. The deed is a covenant not to use the way. *Hollis vs. Carr,* 2 *Freeman,* 3, sanctioned by S. C. 2 *Mod.* 89. *Saltoun vs. Houston,* 1 *Bigham,* 433, *(8 Serg. & Lowb.* 368.*)* An agreement to do an act amounts to a covenant to do it; a recital amounts to a covenant. A court of equity would enforce a specific execution of the agreement against *Myers,* if *Bosley* and *Farnandis* had filed a bill against him. *The Parish of Caister vs. The Parish of Eccles,* 1 *Ld. Raym.* 683. *Jacobson vs. Fountain,* 2 *Johns. Rep.* 176, per *Thompson,* J. But it is said to be a personal covenant, and not to bind *M'Kim.* This would put it in the power of *M'Kim* to perpetrate a fraud on *Myers;* for in *Myers's* deed to *M'Kim* it is expressly stipulated that the alley was not to be used by *M'Kim.* *Myers* intended to guard against his responsibility to *Bosley* and *Farnandis,* by putting

the exception of the right of way in his deed to *M'Kim.* *M'Kim* agreed so to hold the lot. If *Bosley* and *Farnandis* could recover of *Myers*, *Myers* could recover of *M'Kim.* But it is said if the deed of 1815 be a valid deed, *Bosley* has no right to obstruct the right of way. What then? The question here is, has *M'Kim* a right to complain? If he has a right, any other person had a right to complain. This is the first time a court of equity was ever called upon to relieve a man against his own covenant.

*Taney*, also in reply. The alley in dispute here is a private one to a few individuals, and the rights to it were acquired by contract, and depend solely upon contract. It was laid out for a way, and outlet and passage for the water, by the original proprietor of the ground. The lots are entitled to the alley as an easement. For that purpose the plot, by which they were sold, so represented it. Mrs. *Lawson* contracted that it should be a way and passage, as well as a way for water. *M'Kim* must show himself entitled to the easement he claims, and that such title is opposed by *Bosley.* If he has no interest, and no right to the drain of water he claims, he cannot call upon this court to aid him in relation to it. A stranger in interest cannot claim the interposition of the court of chancery. *M'Kim* being a purchaser with notice, is bound to the same extent that *Myers* was bound. He knew of the agreement between *Myers, Bosley* and *Farnandis.* *Sugd.* 526.

1. Was *Myers* entitled to the relief at the time he sold to *M'Kim?*

2. If *Myers* was entitled, is *M'Kim* entitled under his contract with *Myers?*

1. The agreement of *Myers* in 1815 extinguished all right which *Myers* had. But it is said it was obtained by fraud, and without consideration; and that independent of the agreement itself, there is evidence of the fraud. Can parol evidence contradict the plot by which the property was sold? The exhibition of the plot at the sale makes the plot as binding on the parties as would be written terms of sale, and they cannot go out of the plot to prove that the lots were not sold according to the plot. *Sugd.* 22, 23. Here *M'Kim* claims a contract of sale

of the alley, and a specific execution of it. It is said there was a pencil-mark made on the plot at the sale, connecting lots 1 and 13, so as to make them one lot. The great bulk of the evidence is that there was no such mark. *Myers's* own testimony is that it was not there, and he purchased without hearing that the two lots were to be connected so as to take in the alley. If *Myers* acquired no right at the sale, then there was no fraud in *Bosley* in stating to him that he had no right to build over the alley. But it is said *Myers* obtained the right under a verbal contract with *Bosley*. That contract was but a license to build over the alley, and on a part of it, but not on the whole, and to leave an opening by a gate. A license to occupy a part is not a license as to the whole. A license is always revocable. *Myers* acquired a right as against *Bosley* to seven feet to the alley. How then did he acquire a right to the other part? The remaining part to the alley remained as it did at the sale. But as to *Farnandis* there was no consent. When a party, with a full knowledge of his rights, makes a contract, there can be no fraud in a man in contracting with him. There being a nuisance caused by *Myers*, *Bosley* had a right peaceably to prevent it. If any force or violence was used, it was by *Myers* in pulling down or preventing the obstruction of the nuisance. It could not be menace or duress, it is personal fear. Duress and fraud act differently. To make it fraud *Bosley* must have insisted upon a title which he had not. But suppose *Bosley* had no right to the alley, but believed he had a right of way between No. 1 and 13, there can be no fraud in his asserting the right. There can be no fraud unless his knowledge that he had no right, is brought to him, and that he intended a fraud on *Myers*. *Myers* was not deceived by any thing coming from *Bosley*. He acted upon his own knowledge. Was *Bosley* wrong? Learned counsel would have advised *Myers* to do what he did. Was the title of *Myers's* rights secured against *Bosley* and *Farnandis?* It was not a secure title, and he was right in making the contract with *Bosley* and *Farnandis*. *Myers* was not mistaken in the facts. Was he mistaken as to the law? Ignorance of the law is never presumed. It must be proved, and there is no evidence to show, that *Myers* was ignorant of his rights. The deed of 1815 operated as an extinguishment. If the deed

did not operate to pass the right in gross, it can operate to extinguish, and M*yers* is estopped from saying it did not operate to extinguish his right. 1 *Thomas's Coke Litt.* 328. As to recitals being agreements—1 *Pow. on Cont.* 236, 238, cites *Greaves vs. White*, 2 *Freem.* 57. Chancery would enforce the agreement. But B*osley* is not here seeking to enforce it; it is M*'Kim* claiming under M*yers*, who is seeking to avoid it. The two parties stand very differently. Here M*'Kim* claims equity, without doing equity. If the recital is to operate as a covenant, there is an end of the case. But the granting part will operate as a covenant, (if it will not operate as a grant,) that he will not use the right of way, or any right on that part of the alley. It is like the case of *The Parish of Caister vs. The Parish of Eccles*, 1 *Ld. Raym.* 683, which was at law. The end the parties had in view is carried into effect. If the right itself could not be severed or extinguished, yet M*yers* could covenant not to use it. *Eden on Injn.* 223. If it is a covenant not to use the alley, then, the conclusion is irresistible, M*'Kim* cannot use the alley. What is M*'Kim's* equity? He has not shown that the deed was obtained by fraud, &c. He has no pretence of equity. He has shown none. Supposing the contract a valid one free from fraud, mistake, &c. his right to the alley, if any he had, was a voluntary gift of Mrs. *Lawson*, for which he paid nothing. M*yers*, at the time he sold to M*'Kim*, had no right, and M*'Kim*, purchasing with notice, cannot stand in a better situation than M*yers* would, and he is bound by it. Whatever is contracted to be done, is considered in equity as done. Nothing could pass to M*'Kim*, because all right and equity being out of M*yers*, he could not convey it to M*'Kim*. But it is said if M*yers* was bound, M*'Kim* is not, because the right followed the inheritance. That it run with the land, and could not be severed. *Taylor vs. Stibbert*, 2 *Ves. jr.* 437. Suppose an innocent mistake, and M*'Kim* purchased with a knowledge of the deed, he cannot set up the mistake. He does not stand here as M*yers*, would stand. He paid nothing, and purchased with the exception of the right of way. If his deed conveyed it to him, it is without consideration. M*'Kim* then has no right to come into equity, and claim relief from the mistake. The party

himself, upon whom the mistake operated, might have been relieved against it, but not he who purchased with notice, and an acquiescence. *M·Kim* comes here as a mere volunteer—Will equity grant him what he asks? Parol evidence cannot be offered to contradict a written instrument, unless fraud, mistake or surprise, is alleged. *Westley vs. Thomas*, 6 *Harr. & Johns.* 24. The deed from *Myers* to M'*Kim* does except the right to the alley. Upon the true exposition of that deed, it does except the right of the alley or outlet. The intention of the parties is to be regarded. It cannot be subject to the agreement, unless controled by it; and it admits the agreement. It is a covenant on the part of *M'Kim*, barring him in a court of equity, and binding him to fulfil the agreement. It is said the claim of *M'Kim* is only to pass the rain water—a natural right which he claims the benefit of; that this natural right could not be passed away. Admit that it could not, yet there might be a covenant to give up and relinquish it. The bill does not charge that the alley was the natural course for the rain water. That fact was not put in issue. It is stated as a matter of belief, that the water did pass down the alley; but it is not charged that that was the natural conduit of the water. But admit the water to have gone naturally in that direction, could it by a mound be collected water, and pass in a current upon the adjoining property? If this could be done in the country, yet it cannot in a city, where many rights must be and are surrendered. The right, therefore, of passing the rain water in a city is by contract, and there are no natural rights there upon the subject; artificial drains in a city are substituted for natural ones. *Myers's* right to pass the rain water was by contract, and was not a natural right; and being so, he could pass that right, or bar himself from using it. He has severed it by contract, as he well might, being held by him under contract. It is said there was a parol contract by *Bosley* to permit the water to flow until it became a nuisance, which was not reduced to writing at the time of the deed of 1815. Can parol evidence be admitted to prove a parol contract different from the written one? The bill does not allege any contract not stated in the written one, and that the written contract does not contain the sense of the parties. *Westley vs. Thomas*, 6 *Harr. & Johns.*

24. But there was no contract, but merely a *permission.* *Myers* proved that *Bosley* might stop the water when he pleased, and that there was no right to the alley or outlet. When it became a nuisance, the obstruction complained of was erected. So long as the water flowed through the gate nothing was said by *Bosley.* But the gate was taken away and the passage considerably narrowed. Then the nuisance became highly offensive. When so, *Bosley* interfered to prevent the water from passing that way. *M'Kim* does not claim the easement, as *Myers* did, but claims a greater privilege, and walls up the passage way, leaving a small hole for the water to pass through.

*Curia adv. vult.*

STEPHEN, J. at this term delivered the opinion of the Court. *Elizabeth Lawson*, being seized in fee simple of a parcel of ground lying in the city of *Baltimore*, caused the same to be divided into lots, and alleys for the benefit thereof, and a plot of the whole to be made, with a view to expose the same to sale, and on or about the first of December 1809, caused the said lots, or some of them, to be set up to public auction. At said sale *Jacob Myers* became the purchaser of the lots designated on said plot by the numbers one and thirteen. The bill charges that the said *Myers* purchased the said lots, with an understanding that the portion of the north and south ten feet alley, intervening between the said two lots, should be included in his purchase, and that he should have the same right and title to that as to the lots themselves. The bill further states, that at the said sale a certain *James Bosley* became the purchaser of lots number two and number fifteen: that a certain *John Small* became the purchaser of lots number three, four and fourteen; and that *Samuel* and *Walter Farnandis* became the purchasers in common of the lot number five; all of which last mentioned lots bounded on the north and south ten feet alley. The bill further charges that the said alley was designed for the accommodation of the purchasers of the lots bounding thereon, as a way or passage, and as an outlet for rain water, and other similar purposes, through the ground of the said *Elizabeth Lawson* down to *Jones's Falls.* In the spring of 1810, *Jacob Myers,* under an impression that he had purchased,

the intervening alley, as well as the adjacent lots, began to build on the lots purchased by him, and erected his buildings upon a part of the alley. After the completion of the buildings aforesaid, he resided several years in the same, until about the year 1815, when *Bosley* began to question the right of *Myers* so to cover with his buildings the said part of the said alley, and began to threaten to disturb him in the occupation thereof; and the bill charges that he insisted that he could make him pull down and take away such portion of his said buildings, or improvements, as were placed upon the alley, in virtue of a right in himself, and the said *Samuel* and *Walter Farnandis,* to the use of the said part of the said alley; it further states that *Myers,* becoming alarmed for his title to the said part of the said alley, and for his buildings thereon erected, was induced to doubt his own unquestionable rights, and being anxious to avoid a law suit, on the first of July in the year 1815, joined with the said *Bosley,* and *Samuel* and *Walter Farnandis,* in the execution of a deed, by which, in consideration that the said *Bosley* and *Farnandis* transferred to him, *Myers,* his heirs and assigns, all their right, title, interest and claim of, in and unto, all that portion of the said alley which had been built upon by him, he *Myers* transferred and relinquished to them, their heirs and assigns, all his right and title to the use of the alley, except the part built upon by him as above mentioned. On the seventh of November, in the year 1816, *Jacob Myers* conveyed to *John M'Kim* all his right and title to the property, so as aforesaid purchased by him at the sale of *Elizabeth Lawson,* subject, however, expressly to the contract so as aforesaid entered into by him with the said *Bosley* and *Farnandis,* bearing date on the first day of July, in the year 1815. Some time after the purchase of *M'Kim* from *Myers, Bosley* obstructed the passage of the water, from *M'Kim's* property, down the alley, relying for his authority so to do upon the said deed of the first of July 1815; and *M'Kim* filed a bill in chancery to compel the removal of the said obstruction, and to be quieted in the use and enjoyment of said alley, as alienee and assignee of the said *Myers.* The injunction prayed for was granted. *Bosley,* in his answer, denies that at the said sale, (which he states he attended from first to last,) there was any understanding that the

purchaser of lots number *one* and *thirteen* should become entitled to the intervening alley.   He also admits that he permitted *Myers* to build on a part of said alley upon certain terms; but denies that he ever intended to relinquish, or ever did relinquish, his right or title to the said intervening portion of said alley, except for an adequate consideration, or in other words unless *Myers* relinquished all his right and title to the residue of said alley.   The bill charges that the deed of the first of July 1815, was unduly obtained by *Bosley*, by menaces and threats, operating upon the fears and timidity of *Myers*, and from a misapprehension, on the part of *Myers*, of his legal rights; all of which is denied by *Bosley* in his answer.   On the 10th day of January, in the year 1824, *Baltimore* county court, in the exercise of its chancery jurisdiction, decreed the injunction, which had issued according to the complainant's prayer in his bill, to be perpetual.   From this decree the respondent in the court below prayed an appeal to this court; and upon the merits and propriety of that decree this court are now called upon to pass their judgment.   The first question which presents itself to the consideration of this court is, whether *Jacob Myers* can be considered as the purchaser of the intervening alley between lots numbered *one* and *thirteen,* as well as of the lots themselves?   From the whole of the proofs, consisting of the acts of the parties, and the evidence, documentary and parol, this court are led to the conclusion that he was not.   If he was not the purchaser of the intervening alley; there was a good and valid consideration to support the deed of the first of July 1815.   M'*Kim* became the purchaser of lots number *one* and *thirteen,* with a perfect knowledge of the contract entered into by *Myers,* under whom he claimed, with *Bosley* and *Farnandis;* although then he might have acquired the legal title to the intervening alley in virtue of the deeds from *Lawson* to *Myers,* and *Myers* to him, still it may be asked, what equity had he in the face of *Myers,* contract, subject to the operation of which he expressly purchased, to sustain his application to a court of chancery for relief in the manner and to the extent he has asked it.   It is the opinion of this court that he had none.   It was contended, in the course of the argument, that the deed of the first of July 1815, did not operate to trans-

fer the right of the parties to that instrument to the use of the alley; that it was a right of way appendant, which could not be severed from or pass without a transfer of the lots to which it was appendant. But it is perfectly clear, that in equity a contract may operate efficiently to carry the intention of the parties to that contract fully into effect, although at law it might be wholly inoperative. "Equity which adverts to the substantial object of all contracts, independent of the forms which they assume, gives effect to the intent of the parties, by considering their acts as evidence of such a contract or agreement as will produce what is stipulated." One case only, and that a familiar one, will be mentioned as illustrative of this doctrine of a court of equity. An assignment of a *chose in action*, as a bond or the like, which in law is not assignable, is valid in equity. For a court of equity proceeds upon the principle, that the assignment, although not effectual as such at law, the bond not being assignable in point of interest, amounts nevertheless to a covenant or agreement that the assignee *shall* receive the money to his own use, which covenant or agreement that court will carry into specific execution. Upon this subject—see 1 *Powell on Contracts*, 189, and the cases there referred to.

Taking this view of the subject this court do not deem it necessary to enter into an examination of all the questions which were raised in the course of the argument, it being sufficient to decide the case before them, that the appellee had no equity to support his application to the court below for an injunction.

DORSEY, J. added. The annals of judicial proceedings do not furnish a case where a court of equity has granted a perpetual injunction to a plaintiff, to protect him in the enjoyment of a naked legal right, which he, and those under whom he claims, have by the most solemn deeds stipulated not to exercise; yet such is the predicament of the complainant in this case, such the interposition sought by him.

Legal rights are to be asserted by legal means, and in such cases courts of equity never lend their aid where equity and justice do not imperiously demand it. What species of equity would that be, which would exert itself to destroy a right, secured, as far as it can be done, by deeds founded on adequate

considerations, and vest it in him who had paid no consideration therefor, but had agreed, in express terms, by the deed under which he makes title, not to claim such right. This is the kind of equity sought for in this cause.

BUCHANAN, Ch. J. dissented. [The Reporter shave been requested by his honour Ch. J. *Buchanan* to say, in their report of this case, that his dissent from the opinion of the court was not founded on a belief that any part of the fraud alleged in the bill to have been committed by the appellant, *Bosley*, was established by the evidence in the cause; but on the contrary he was satisfied the charge was not at all supported by the proof. That his opinion rested entirely on other grounds.]

DECREED, that the decree of *Baltimore* county court, sitting as a court of equity, be reversed, but without costs; and that the injunction, heretofore issued, be dissolved, and the bill of the complainant be dismissed.

DECREE REVERSED, &c.