THE NIAGARA FALLS INTERNATIONAL BRIDGE COMPANY and
the NIAGARA FALLS SUSPENSION BRIDGE COMPANY *vs.*
THE GREAT WESTERN RAILWAY COMPANY and the NEW
YORK CENTRAL RAIL ROAD COMPANY.

The plaintiffs, having erected a suspension bridge across the Niagara river,
leased the rail road floor thereof, excepting the side-walks and gates, to
the Great Western Railway Company, during the continuance of its char-
ter, at an annual rent. The railway company was to have the right to ex-
tend to other companies and persons the privilege of crossing the rail road
bridge, with locomotives, trains and cars, carrying passengers and freight,
&c. subject to certain conditions. It agreed not to afford the means to
other persons, except rail road passengers, of crossing, and evading the
payment of tolls, and was to be responsible that the companies, &c. to
whom it should underlet should keep within the restrictions. Regular
rail road passengers, coming from or going to a point five miles distant,
were, on producing tickets from the rail road company, showing them to
be such passengers, to be permitted to pass free of toll. The rail way
company agreed to adopt reasonable regulations necessary to prevent eva-
sions of the rights of the plaintiffs to have tolls from all except legitimate
railway passengers. It also agreed to allow from its own company, and
to procure from the rail road companies with which it should arrange for
the use of the bridge, free tickets for the directors and officers of the
bridge companies, over their respective railways. An agreement was sub-
sequently made between the Great Western Railway Company and the
N. Y. Central Rail Road Company, touching the use of the bridge by the
latter company, for the interchange of passengers and freight. The plain-
tiffs, in their complaint, alleged continued breaches of the contract by the
railway company, in the use of its cars in carrying passengers across the
bridge, and also in not procuring free tickets or passes for the plaintiffs'
directors, &c. over the road of the N. Y. Central Rail Road Company. The
complaint alleged that the plaintiffs had sustained large damages, and, as
a part of their relief, prayed for a perpetual injunction. The referees
found, as facts, that the G. W. Railway Company had refused to furnish
or procure for the plaintiffs' directors free passes over the N. Y. Central
Road, who had thereby been compelled to pay $486.61 for fares; that the
company had permitted persons who were not railroad passengers entitled
to pass free, to cross the bridge on its cars without payment of tolls to the
plaintiffs, and had collected tolls of persons so crossing; and that the com-
pany; though often requested, had never adopted or enforced reasonable
regulations necessary to prevent evasions of the plaintiffs' rights to toll for
crossing their bridge, by persons not entitled to cross free.

*Held*, that the defendant was bound to perform its agreement, by adopting
and carrying into effect the reasonable regulations necessary to prevent

evasions of the plaintiffs' rights; that the plaintiffs were entitled to recover the sums paid for the fares of their directors over the N. Y. Central Road, and the amount of tolls found to have been collected by the defendant from passengers not entitled to pass free; and that they were entitled to an injunction.

*Held, also,* that such injunction could be sustained upon the ground that an action at law, for damages, would afford no adequate redress, and the injury to the plaintiffs would be irreparable.

*Held, further,* that by using the bridge in a manner prohibited by the agreement, and permitting persons to cross it free, the defendant was guilty of a continual nuisance, within the authority of the case of *Thompson* v. *The N. Y. and Harlem Rail Road Company*, 3 (*Sand. Ch. Rep.* 625,) which might be restrained by injunction.

THE plaintiffs are corporations. The creation of the first named was authorized by an act of the legislature of the state of New York, and the second by the legislative authority of Canada. They erected the suspension bridge across the Niagara river below the falls, extending from the bank of the river in the state of New York, to the bank of the river in Canada. The New York Central Rail Road is a corporation owning a rail road from the east end of the bridge, eastward through the state of New York, to Albany, &c.; and the Great Western Railway Company is a corporation having a railway from the west end of the bridge, westward through Canada West. October 1, 1853, the plaintiffs entered into an agreement with the Great Western R. W. Co. in the form of a lease. An agreement to lease, (the bridge and road not then being completed) by which the plaintiffs leased and let to the Great Western R. Co. the rail road floor and structure, excepting the sidewalks and their gates, to be for the entire use of the railway company, and under their control, for and during the continuance of their charter, at a rent of $45,000 a year. The agreement contains many special provisions; among them, in substance, that the plaintiffs were to have the control and use of the lower, or carriage way of the bridge and its approaches, and the sidewalks of the upper railroad floor and their approaches, &c. The railway company was to have the exclusive right to extend to

other companies and persons the privilege of crossing the rail road bridge with locomotives, trains and cars carrying passengers and freight, and pursuing a legitimate railroad business, subject to certain conditions. The railway company was not to afford the means to other persons, except rail road passengers, of crossing and evading the payment of tolls to the bridge companies, and they were to be responsible that the companies and individuals to whom they should underlet should keep within the restrictions—they having all the profits arising therefrom. Regular rail road passengers, coming from a point five miles distant from the bridge, or going to such point, on producing tickets from the rail road company, showing them to be regular rail road passengers, were to be permitted to pass over the upper side-walks and lower floor free of toll, walking or riding ; the bridge companies having the right to charge the regular toll on the carriages. The railway company was thus restricted, and it agreed to adopt reasonable regulations, necessary to prevent evasions of the rights of the bridge companies to have tolls from all except legitimate railway passengers ; and if any agents should be guilty of collusion or evasion, the railway companies were to dismiss such agent, on the fact being made known to them. The bridge companies were to allow the directors and employees of the railway company and such other railway companies as the Great Western should make arrangements with, free tickets to pass the bridge, and the Great Western agreed to allow from their own, and procure from the rail road companies with whom they should arrange for the use of the bridge, as aforesaid, free tickets for the directors and officers of the bridge companies over their respective railways. An agreement bearing date September 29, 1856, was made between the Great Western Railway Co. and the New York Central, touching the interchange of passengers and freight and the use of the bridge. All passengers and their baggage were to be changed in the depot of the New York Central, at the east end of the bridge. The freight

brought by the Great Western to the bridge for the New York Central Rail Road Co. was to be conveyed across the bridge in the cars of the Great Western, and placed alongside the freight warehouse of the New York Central, and the freight brought by the New York Central to the bridge, to pass over the Great Western, was to be conveyed in the cars of the New York Central company, and placed free of expense or charge for tolls to the Central, alongside the freight warehouse belonging to the Great Western Company. The Great Western also undertook not to permit any passenger trains of any other company than its own to cross the suspension bridge.

The plaintiffs complained of a breach of the contract touching the use of the cars by the Great Western Railway Company, in carrying passengers across the bridge, and also in not procuring free tickets or passes for their directors over the road of the New York Central Rail Road Company. They complained of continual breaches of the agreement relating to passengers crossing the bridge in the cars of the Great Western, and alleged large damages, and as a part of their relief, they prayed for a perpetual injunction. The issues joined were referred to three referees, who found the facts above stated ; and also, among other things, that since March 23, 1855, the defendants have used the bridge, the Great Western for the passage of passengers and freight trains, and the New York Central for freight trains only. Each of the plaintiffs has had a board of seven directors since March, 1855, who have had no compensation for their services, except the free passes stipulated for in the agreement with the Great Western ; and they have had a superintendent and secretary appointed by them jointly, and the Niagara Falls Bridge Company a secretary of its own. That the Great Western has since June 1, 1858, refused to furnish or procure for any of the plaintiffs' directors free passes over the rail roads of the New York Central Company, though often requested, and that the directors have had frequent

occasion to pass over such rail roads between June 1, 1858, and February 26, 1859, when the action was commenced, and by reason of such refusal, such directors have been compelled to pay fares as passengers to the amount of $486.61, and the interest thereon from the commencement of the action to the date of the report was $65.64. That the Great Western, between March 23, 1855, and February 26, 1859, has permitted persons other than the employees and directors of the defendants, and who were not rail road passengers entitled to pass free, under the agreement or otherwise, occasionally to cross the bridge on their cars, without payment of tolls to the plaintiffs, and has collected tolls of persons so crossing, whereby the plaintiffs sustained damages in the loss of their tolls, to the sum of $361.33. That the Great Western Railway Co. has never adopted or enforced reasonable regulations necessary to prevent evasions of the plaintiffs' rights to toll for crossing their bridge, by persons not entitled to cross free, although the plaintiffs have often requested the said defendant to adopt and enforce such regulations.

As conclusions of law, the referees decided that the plaintiffs were entitled to recover of the defendant, the Great Western Railway Co., the sum of $486.61, and the interest thereon, $65.64, and the sum of $361.33, being in the aggregate $913.58, as and for damages sustained prior to the commencement of the action, for the aforesaid breaches of the agreement. And that the plaintiffs are entitled to an injunction, as prayed for, restraining the Great Western Railway Company, &c. That the complaint be dismissed as to the New York Central Rail Road Company, with costs, and that the plaintiffs have costs against the Great Western. That a judgment be entered accordingly, but without prejudice to the plaintiffs, or the defendant, the Great Western, to apply to the court upon the footing of the judgment, for a modification of the injunction, &c.

Judgment was entered pursuant to the decision of the

referees, and the defendant, the Great Western, filed exceptions which are sufficiently noticed in the opinion, and appealed to the general term of this court.

*F. E. Cornwell,* for the plaintiffs.

*S. T. Fairchild,* for the defendants.

*By the Court,* MARVIN, P. J. The defendant excepted to the final report of the referees, and the judgment entered thereon, and to each and every part thereof, and particularly to certain portions of the report finding certain facts, and to the conclusions of law or judgment touching damages, and the injunction. There is a particular exception to the finding of the referees, that the Great Western Railway Company granted to the New York Central Rail Road Company the right to the use of the bridge for the carriage and transportation of freight across the same. This finding of the referees is important, as upon it, the item of damages for neglecting to furnish to the directors of the plaintiffs, free passes over the New York Central is made to depend. This fact was so found from written evidence, and rests upon construction. In the agreement of September 29, 1856, between the two rail road companies, it is provided that "the freight brought to Suspension Bridge by the New York Central Rail Road Company to pass over the Great Western Railway is to be conveyed in the cars of the New York Central Company and placed free of expense or charge for tolls to the New York Central Company alongside the freight warehouse belonging to the Great Western Company and hereinafter referred to." By the agreement or lease of October 1, 1853, the defendant was to have the exclusive right to extend to other companies and persons the privilege of crossing said rail road bridge with locomotives, trains and cars carrying passengers and freight on such terms as they might agree to, subject however to the conditions prescribed in the indenture to the defendant.

In a subsequent article it is provided that the plaintiffs are " to allow the directors and employees of the defendant, (Great Western,) and such other railway companies as they shall make arrangements with, free tickets to pass their bridge, and the parties of the second part (the Great Western) shall allow from their own and procure from the rail road companies with whom they shall arrange for the use of the bridge as aforesaid, free tickets for the directors and officers of the parties of the first part to pass over their respective railways." On reading these clauses, it seems to me entirely clear that the referees have not erred in their construction of the agreements. The New York Central Company is to convey in its cars, the freight which is to pass over the Great Western, over the bridge to the freight warehouse of the Great Western, free of expense or charge for tolls, that is, no tolls were to be charged to the New York Central. Now is not the New York Central a rail road company with which the Great Western Railway Company made an arrangement for the use of the bridge? Most clearly it is, and an arrangement valuable to the New York Central. It gave the company the use of the bridge free for its freight business destined for the Great Western, and in effect extended its road into Canada. It, at once, under a provision in the agreement between the plaintiffs and Great Western, gave to the directors and employees of the Central free tickets to pass the bridge of the plaintiffs, that is, any portion of the bridge, sideways and lower bridge. It follows that, by the agreement, the defendant was bound to procure from the New York Central free tickets to pass over its railway, for the directors and officers of the plaintiffs. No objection is now made to the validity of such an agreement, but objections are made that the evidence did not show a breach of the agreement. In my opinion the evidence was quite sufficient to sustain the findings of the referees touching the breach of the agreement, and also the damages.

I am also of the opinion that the evidence justified the finding of the referees, touching the permission of persons to cross

Niagara Falls International Bridge Co. *v.* Great Western Railway Co.

the bridge in the cars of the defendant, in contravention of the agreement, and the collection of tolls from such persons, or some of them, and also the amount of damages sustained by the plaintiffs by reason of such breaches of the agreement. The conclusion of law, to which the referees came, touching the damages, is not erroneous. This brings us to that part of the judgment awarding an injunction, and of which it is understood the defendant (the Great Western) most complains. It is insisted that a proper case for an injunction has not been made. That this question may be properly considered, it may be well to bring together, briefly, the leading facts of the case affecting the question.

The plaintiffs constructed and own the suspension bridge, or rather bridges, as there are two, one above the other, the lower bridge for carriages and foot passengers, and the upper one, having a rail road track, to be used by locomotives and trains of cars. It has also sidewalks for foot passengers. The plaintiffs leased to the defendant "the rail road floor and structure including all its supports, fixtures and gates, excepting the sidewalks and their gates, to be for their (the defendant's) certain use and under their control for and during the continuance of their charter, for rail road purposes." The defendant also has the exclusive right to extend to other companies and persons the privilege of crossing the rail road bridge with locomotives, trains and cars conveying passengers and freight subject to the conditions and restrictions prescribed. The lower bridge and the sidewalks of the upper rail road floor were to be under the control and for the use of the plaintiffs. It is declared in the agreement to be understood that the privilege of the defendant was for the purpose of passing locomotives and cars with freight and passengers in the prosecution of legitimate rail road business, and that it was not to afford the means to any other persons or person except rail road passengers, of crossing and evading the payment of tolls to the plaintiffs, and the defendant stipulated to be responsible that the companies or individuals to whom they should underlet

should keep within the restrictions and conditions. The plaintiffs agreed to permit rail road passengers to pass over the upper side walks and lower floor free, on the production of tickets showing that they were regular rail road passengers, coming from or going a distance of five miles east or west, to or from the bridge. If such passengers rode across in carriages, then the plaintiffs were permitted to charge the regular toll on the carriages. It was agreed that the defendant should not carry passengers over the bridge or give tickets to them unless they had come or were going at least five miles to or from the bridge; and that the defendant should at all times adopt such reasonable regulations as should be necessary to prevent evasions of the rights of the plaintiffs to have tolls from all except legitimate railway passengers.

The case shows that these provisions have been constantly violated. Persons are carried over the bridge in the cars of the defendant almost daily who are not *regular rail road passengers,* and at times these persons are numerous. It was made a matter of complaint by the plaintiffs for a long time prior to the commencement of the action, and some efforts were made by the defendant to correct the evil. It was arranged at one time that the plaintiffs should put a collector upon the trains for the purpose of receiving or collecting tolls of persons passing over in the cars, who were not the regular rail road passengers, and such collector was employed for a short time, when the defendant excluded him from the cars, the arrangement working badly, and in practice producing difficulties with passengers. The defendant employed, and I suppose still does employ, *a bridge conductor* to take the trains from the New York Central depot across to the defendant's depot, and he collects twenty-five cents from every passenger over the bridge *who has no ticket,* or it is made his duty to do so. It is not made his duty to ascertain where the passenger from whom he collects, is going.

The conductors on the trains of the defendant from the west continue on over the bridge to the New York Central depot,

and they collect *bridge fares* and pay over in gross to the bridge conductors. No fare is collected of those who have regular rail road passenger tickets. Now it may be that the person from whom fare is thus collected came to the bridge a passenger in the cars a distance of five or more miles, or that he is going, a passenger in the cars, a distance of five or more miles, and if so, the defendant, by the agreement, had and has the right to carry him across the bridge in its cars. Or it may be that such person is only " passing from one side of the river to the other," and if so, the defendant has no right to carry him in its cars. Some attempts have been made to distinguish those who were passing simply from one side of the river to the other from those called regular rail road passengers, but thus far those efforts have proved substantial failures. It is obvious that the plaintiffs have no practical means of ascertaining who are or who are not properly carried over the bridge by the defendant. The bridge is a mile or so down the river from Niagara Falls, and is resorted to as the place of crossing from one side of the river to the other by a large portion of the persons visiting the Falls. The plaintiffs have no right to put a collector upon the cars, and if they had it would not be possible for him to ascertain who were not " regular rail road passengers." This was tried for a short time with the consent of the defendant and it worked badly. A train crosses the bridge in two minutes, and it is not possible for the bridge conductor employed by the defendant to pass through the cars and make the collections when the train is composed of four or more cars. One witness says, a man who had only to collect tickets, and make no change, might go through the cars while crossing the bridge. The bridge conductor employed by the defendant, it would seem, went through the cars and collected what he could, and sometimes the conductor does not pass through the cars and no collections are made. One of the bridge conductors states that he could not tell where persons were going or where they came from; he had no time to ascertain; he collected fare

from those having no tickets. In short, it is entirely clear that the plaintiffs have no practical means of protecting their rights—no means of ascertaining the extent of the violation of the contract by the defendant and the amount of damages they sustain by reason of the breaches of the contract. It appears from the evidence in this case that the defendant received from its bridge conductors for tolls received from persons having no rail road ticket from July 2, 1855, to February 15, 1859, the sum of $9650.62. What portion of this was from persons going simply from one side of the river to the other it was impossible to determine. I think it quite probable that the largest portion was from such persons, and so difficult of ascertainment by the plaintiffs was the fact that the referees, confining the plaintiffs to no strict legal evidence, have only found this item of damages to be $361.33, and this includes persons carried over by the defendant free—that is, persons the defendant had no right to carry over, but did carry, without collecting any thing from them.

I think it is pretty clear from the agreement between the parties, that it was supposed that there might be some difficulties arising from persons getting on to the cars and passing over the bridge, and it must have been foreseen by the plaintiffs that they would have no means of preventing such acts, or adequate means of knowing the extent and number of such acts; hence they carefully provided in the contract against them, and the entire responsibility for preventing such acts was placed upon the defendant, and the defendant agreed that it would at all times adopt such reasonable regulations as should be necessary to prevent evasions of the rights of the plaintiffs to have tolls from all except legitimate railway passengers. Though the defendant may have some difficulty in putting a stop to the carrying of passengers simply from one side of the river to the other, such difficulty is not insurmountable. It can establish such regulations as will effectually put a stop to the carrying over the river in their cars any persons other than those it has a right to carry. It has

full control of the rail road floor, the track, and of its cars. It can adopt a system by which it will be able to exclude from its cars all persons not rightfully in them, and it has undertaken, with the plaintiffs, to do this, and it is not unreasonable that it should be required to perform its obligation. By failing to perform, the plaintiffs are greatly damaged, and they have no adequate remedy. True, they may resort to an action for a breach or breaches of the agreement, and may recover when they are able to show breaches, but from the circumstances and nature of the business, it is entirely clear that the plaintiffs will never be able to detect and give evidence of one in ten or a hundred of the breaches of the agreement. The defendant and its agent will not know or be able to inform the plaintiffs, so long as its business shall be conducted as it has been. It may continue to collect tolls, but it will not know, as it has not known, whether such tolls legitimately belong to itself, or whether they are the fruits of a violation of its agreement with the plaintiffs. It must perform its agreement by adopting and carrying into effect the reasonable regulations necessary to prevent evasions of the plaintiffs' rights. In my opinion the referees did not err in deciding that the plaintiffs were entitled to an injunction. It may be that no case precisely in point can be found in the books, but it will not, therefore, follow that the remedy by injunction should not be applied. The jurisdiction of courts of equity, touching injunctions, has been defined and settled in a great variety of cases, but it has never been held that new cases could not arise in which the remedy by injunction would not be applied. It is undoubtedly a general rule, that when the remedy is ample and clear at law, and has ever been so, a court of equity will not entertain jurisdiction.

The legal remedy for the breach of an agreement or covenant, is an action for the recovery of damages; hence, as a general rule, a court of equity will not interpose in advance by injunction to restrain a party to a contract from its breach, but if the contract should be broken, will leave the complain-

ing or injured party to his remedy by action for damages. If, however, it should be made clearly to appear that the remedy by action for damages would be imperfect and inadequate, a case would be presented in which a court of equity, upon well settled principles, may interpose, and if necessary restrain the party from violations of his agreement. Story says: The jurisdiction of courts of equity has its true origin in the fact that there is either no remedy at all at law, or the remedy is imperfect and inadequate. (*Story's Eq.* § 864.)

In the present case it is perfectly apparent that the remedy by action for damages is imperfect and inadequate. It will afford little or no redress for the grievance complained of. Indeed, until the defendant shall adopt regulations enabling it to ascertain the persons carried across the bridge in its cars, contrary to the agreement, there will be no practicable means of ascertaining the damages of the plaintiffs, and the proof upon which to award damages must come exclusively from those in the employ of the defendant.

Why do courts of equity award injunctions in patent cases? The patentee may recover damages in his action at law for any violation of the rights secured to him by his patent. But this remedy is inadequate, and in order to prevent irreparable mischief or to suppress a multiplicity of suits and vexatious litigations, equity interferes by injunction. (*Story's Eq.* § 930. *Phillips on Pat.* 451.)

Another head of equity jurisdiction, by way of injunction, is the prevention of private nuisances, and this rests upon the principle of restraining irreparable mischief, or of suppressing oppressive and interminable litigation, or of preventing multiplicity of suits. There must be such an injury as from its nature is not susceptible of being adequately compensated by damages at law, or such as from its continuance or permanent mischief, must occasion a constantly accruing grievance, which cannot be otherwise prevented but by injunction. (*Story's Eq.* §§ 925–929. *Roberts on*

*Principles of Equity*, 204.) An injunction will be granted to prevent a party from making erections on an adjacent lot in violation of his covenant. And see *Barrow* v. *Richard and others*, (8 *Paige*, 351,) where an act was done in contravention of covenants, and it was held that an injunction was proper. In *Thompson* v. *The New York and Hudson R. R. Co.* (3 *Sand. Ch. R.* 625,) the franchise of a toll bridge company was violated by the defendants permitting persons to cross its bridge free, and it was held that the bridge company was entitled to an injunction to restrain such nuisance.

Injunctions are also granted in aid of specific performance, and to restrain breaches of trust and confidence. (*Drewry on Inj.* 250, *chap.* 6.) Equity in many special cases will restrain acts inconsistent with the due performance of agreements. Many cases are cited by the author in the chapter referred to. In *Martin* v. *Nutkin*, (2 *P. Williams*, 266,) there was a written agreement that a certain church bell should not be rung at a certain time, and an injunction was granted restraining the ringing of the bell contrary to the agreement. In *Morris* v. *Colman*, (18 *Ves.* 437,) an injunction was granted restraining the defendant from writing dramatic pieces for another theatre, in violation of his covenant. It was not regarded as a covenant in restraint of trade. (*See Story's Eq.* § 958.) Injunctions in the nature of specific performances are often granted to restrain breaches of covenants between landlord and tenant; as covenants not to remove manure or crops, not to plow meadows, not to dig gravel, sand or coal. In this way the court, in effect, secures a specific performance, and prevents irreparable mischief. (*Story's Eq.* § 721.) In short, without pursuing the question, in my opinion the injunction in this case may be sustained upon the ground that an action at law for damages will afford no adequate redress, and the injury to the plaintiffs will be irreparable. If, in truth, redress could be had by action for damages it can only be had by a multiplicity of actions and litigation without end. The case is peculiar;

the franchise of the bridges belonged to the plaintiffs, and they leased to the defendant a portion of the bridge for a certain purpose ; under a very special arrangement that it should not be used in a certain specified manner, which if so used, would greatly affect the plaintiffs in their franchise rights retained by them. By using the bridge in the manner prohibited by the agreement, the defendant is guilty of maintaining a continual nuisance, within the authority of the case in 3 *Sand. R. supra.* Again, the relation between the parties created by the agreement is in the nature of a trust ; confidence was reposed by the plaintiffs in the defendant, that it would carefully and faithfully perform its obligations, by at all times adopting reasonable regulations to prevent evasions. The plaintiffs knew that without such regulations, their rights could not be protected. By restraining the defendant, according to the terms of the agreement, it will be coerced into the performance of its agreement touching reasonable regulations, and this for its own security.

The judgment has reserved the right to either party to apply to the court for a modification of the injunction upon the footing of the judgment.

In my opinion the entire judgment should be affirmed with costs.

[Erie General Term, February 9, 1863. *Marvin, Davis* and *Grover,* Justices.]