[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 109 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 111 
This appeal has been elaborately argued, both upon the facts and the law; and while many of the propositions present questions of difficulty, there is, I think, no doubt upon the case stated that the plaintiff failed to bring it within any rule or principle which justifies the interference of a court of equity. This conclusion makes it necessary to state with some fullness the circumstances disclosed by the trial court.
In 1852 or 1853, The Albany Northern Railroad Company was organized under the General Railroad Law (Laws of 1850, chap. 140), for the purpose of building a railroad from Albany to Eagle Bridge. The termini of The Rensselaer Saratoga railroad were Troy and Saratoga. The two roads intersected each other at Waterford. The Troy Boston railroad began at Troy and extended northerly beyond Eagle Bridge to the State line, but at no point intersected with the Albany *Page 113 
Northern railroad, nor were its termini the same; but the lines of the two roads were not far apart, were substantially parallel, accommodated the same public with railroad facilities for passengers and freight, and were competing roads. In 1857, the Albany Northern railroad being insolvent, its road, together with its franchise, was purchased on mortgage foreclosure by the Albany, Vermont Canada Railroad Company. In 1859, they being in the same condition, the road under like process was sold to the Albany Vermont Railroad Company. This corporation was organized October 6, 1859, and operated the road about twenty days. On the 12th of June, 1860, they leased to the Rensselaer Saratoga Railroad Company, for the period of its corporate existence, so much of the road as lay between Albany and a point one thousand feet north of the intersection of the two roads at Waterford, with all rights and franchises necessary to its full enjoyment; also its rolling stock, engines and machinery, for an annual rent of $20,000, with a proviso in the lease that in case any part of the Albany Vermont railroad situate east of the Hudson river "shall be used or operated by" that company, "or its grantees, lessees or agents, or under its authority as a railroad, for the transportation of persons or freight, then" the Rensselaer 
Saratoga Railroad Company, lessees, might terminate the lease by notice. Negotiations were at the same time pending in behalf of the plaintiff for the control of that portion of the Albany 
Vermont railroad thus referred to, and prior to September or October, 1860, it had acquired such control as enabled it in those months to remove the rails from so much of its road-bed as was not embraced in the lease to the Rensselaer Saratoga Railroad Company. The rails were sold, and the money ($47,500) arising therefrom, with $2,500 more, making the sum of $50,000, was paid over by the plaintiff or in its behalf to the Albany 
Vermont Railroad Company. In pursuance and further fulfillment of these negotiations, the plaintiff received a lease from the Albany Vermont Railroad Company dated Jan. 1, 1862, in which the lease to the Rensselaer Saratoga Railroad Company is recited, *Page 114 
and that the portion of the line so leased is operated by that company, that "the residue thereof has for a time ceased to be used for the transportation of persons or property upon the same;" then demises to the plaintiff as party of the second part thereto, so long as the companies shall continue to be railroad corporations, the said "residue" of the railroad of the Albany 
Vermont Company lying north of that already leased to the Rensselaer Saratoga Railroad Company, described as "beginning at a line drawn across the same at right angles, at a distance of one thousand feet northerly from its intersection at Waterford Junction with the railroad from Troy to Saratoga Springs, and extending from said line northerly and easterly to Eagle Bridge aforesaid, and all the lands upon which said demised part of said railroad and its said appurtenances are or were constructed, and all the other property thereon," and also, except as hereinafter otherwise provided, "all the alienable rights and privileges of said party of the first part (the Albany Vermont Railroad Company), pertaining to said demised premises, and the use thereof, for the yearly rent of one dollar on each first day of January, during said term," and also provides as follows:"Second. The said party of the second part hereby hires and takes the above-demised premises for the term aforesaid at the rent aforesaid, and covenants and agrees that at all times hereafter during the aforesaid term of this demise, the said party of the second part shall and will do and perform every act and thing which is or may be required of, or binding upon either party hereto, to be done or performed upon, or in relation to the operation, maintenance, condition or use of the said demised line or part of said railroad and property, or any part thereof, or in relation to the roads, highways and highway bridges adjacent to or crossing the said demised part of said railroad, and shall also fully indemnify and save harmless the said party of the first part against any and every non-performance thereof, and also against any and every act or neglect of the said party of the second part, in relation to any of the said demised premises and property and said roads, highways and highway bridges, but such indemnity *Page 115 
shall not extend to any damages to the said party of the first part accruing to its capital stock or franchise from the mere neglect of the said party of the second part to repair or operate said hereby demised line of railroad, unless such repair or operation shall be required by some judgment or order of court, peremptory or alternative, requiring the same, or conditioning thereon, the continuance of such purchase or the full enjoyment by said party of the first part of any of its other property not hereby demised. Third. The said party of the first part hereby expressly reserves to itself at all times the right to abandon the said demised railroad, or any part or parts thereof, in case the same shall be or become requisite in order to protect the said party of the first part and its lessees thereof (the Rensselaer Saratoga Railroad Company) in the full enjoyment of that part of the railroad of said party of the first part not hereby demised, and also reserves the right to change the line or route of said hereby demised railroad, or any part thereof, in case it shall be requisite as last aforesaid, and also reserves the right to terminate the railroad of said party of the first part at its intersection with the railroad of said the Rensselaer Saratoga Railroad Company, in case it shall be requisite as last aforesaid. But it is hereby agreed that in case said party of the first part shall exercise or assume, or undertake to exercise the said rights as reserved, or either or any thereof, without the same being requisite to protect the said party of the first part as aforesaid, the said party of the first part shall not thereby incur any liability whatsoever to the said party of the second part. Fourth. This indenture is executed entirely at the risk of the party of the second part as to the estate or title of the said party of the first part in or to said demised premises, property, etc.; and without any covenant or agreement, express or implied, on the part of said party in relation thereto."
The plaintiff has never operated the road; nor have the premises so demised been used or operated as a railroad since the 4th of April, 1860. They consist of a large number of separate parcels of land, the title to most of which was acquired by "The Albany Northern Railroad Company" under *Page 116 
statutory proceedings (Laws of 1850, supra) or deeds conveying the same, and no other right or interest than the company was authorized to take under that statute, or, in a few instances, by warranty deed. As to some parcels no title appears to have been acquired by that company, or either of its successors. After the abandonment of the road for railroad purposes, the former owners of the property so acquired or taken resumed possession, restored the fences, and by themselves or grantees or tenants, subdued and used the land for farming purposes. The defendants were shown to be a railroad corporation, organized under the laws of this State, and to have entered upon the land for the purpose of preparing it for rails in the construction of a railroad; and it was this entry of which the plaintiff complained. The defendants offered evidence to show that the entry was by consent of the persons then in possession and occupation of the land, and the court excluding it, they excepted. The judgment asked was that the defendants be enjoined from entering upon the property and premises so demised to the plaintiff, and from repairing or grading the same or any part thereof, or laying down rails or operating the same as a railroad. The defenses, among others, were: (1) That the plaintiff had no title; (2) that by judgment of the Supreme Court in an action where the People were plaintiffs and "The Albany Vermont Railroad Company" was defendant, so much of the charter of "The Albany Vermont Railroad Company" as embraced the road beyond the Waterford Junction was vacated; (3) that by amendment of the articles of association of that company, filed Feb. 9, 1878, that part of its road leased to the plaintiff was abandoned; (4) that the lease under which the plaintiff claims is void; (5) that no case was made for equitable relief. The trial court ordered judgment in pursuance of the prayer of the complaint, and also that the defendant railroad company deliver to the plaintiff possession of the property referred to, and that the plaintiff be restored to its possession.
The territory in question has been fruitful of litigation, in which the rights and obligations and exemptions of parties in *Page 117 
respect thereto have come before the courts (19 How. Pr. 523; 12 Abb. Pr. 171; 37 Barb. 216; 24 N.Y. 261); but in this instance only is any one charged with a design to apply it to the use for which, in the exercise of eminent domain, the State permitted the taking or the owners granted land for its formation. When the acts complained of were performed does not appear; but the complaint was verified on the 23d day of February, 1878, and its allegations were met by an admission in the answer, read by the plaintiff as evidence upon the trial "that the defendants have moved soil on the roadway, and prepared it to receive ties and rails for the principal part of the location of the line and many miles in length in the county of Rensselaer." These acts were complained of as violating rights acquired by the plaintiff under the lease above set out. To this lease the learned counsel for the appellants raises various objections, and among others, that it was ultra vires the plaintiff to take, or the Albany 
Vermont railroad to give.
It is well settled that, unless authorized thereto by statute, a railroad corporation organized under our General Railroad Act has no authority to transfer or lease its road. (Abbott v.Johnstown, etc., R.R. Co., 80 N.Y. 27; People v. A. V.R.R.Co., 77 id. 232.) In this case it is claimed that the authority is in the statute (Laws of 1839, chap. 218) entitled "An act authorizing railroad companies to contract with each other." Its terms are general; no form or character of contract is prescribed by which the right conferred shall be effected. "It shall be lawful," it says, "for any railroad corporation to contract with any other railroad corporation for the use of their respective roads, and thereafter to use the same in the manner prescribed in such contract," but not inconsistent with the provisions of the charter of the contracting corporation. In this case the act of 1850 is the charter. Assuming that the statute permits a grant of the exclusive right to use a road, and does not contemplate a mere traffic arrangement, by which each of two companies may use the other's road, is the instrument called a lease, a contract, for "use," within its meaning? It *Page 118 
recites the fact that so much of the lessor's road as had not already been leased to the Rensselaer Saratoga Railroad Company "has, for a time, ceased to be used for the transportation of persons or property upon the same." Within this portion were the premises in question, and with it were included "all the alienable rights and privileges of the lessor pertaining to the demised premises," for the yearly rent of $1. Then, by its terms, the plaintiff "hires and takes the above-demised premises" for the term of its corporate existence at the "rent aforesaid." So far, we find no contract in regard to the use of the road. Moreover, in fact and by recitation in the lease, there was no road used, or susceptible of use, in the manner alone warranted by statute — no possibility of running cars for the transportation of passengers or property — a road-bed without rails, with abutments for bridges, but without superstructures. It was this they were "to have and hold," not the "use" of the road. The word, and the substance of the word, is carefully evaded. "The Albany Vermont Railroad Company" divest themselves of the road, its land, their "rights and privileges pertaining to the demised premises and the use thereof." But no obligation is imposed upon the plaintiff to use; no contract to that effect. It is frankly avowed by the respondent that the competition between the two lines having proved ruinous to both, it was thought desirable that this portion of the Albany Vermont railroad "should be either abandoned or put under the control of the Troy Boston railroad, so that the competition might be at an end," and that to effect this object "it agreed to execute a proper instrument to convey all the right, title and interest in the road between Waterford Junction and Eagle Bridge it could legally convey to the Troy Boston Railroad Company." Between the making of this agreement and its actual execution delay was caused by doubt as to the proper form of the instrument which should express it, and in the lease finally resolved upon we see the object and the agreement consummated. The object was to avoid the use. Hence it is not provided for. The lease expresses the tenure *Page 119 
and its exclusiveness. Nor do the covenants of the lessees go further. They are not covenants or contracts for the "use" of a road, or even to perform or do any thing because of the obligation of the contract, but only to perform whatever is required or binding upon either party in relation thereto. Not a contract to do unconditionally, but a contract to do if either is compelled or required to do. Not as under a contract, but in obedience to compulsion. The concluding covenant so qualifies and limits the preceding, as to exclude the idea that any "use" of the road was contracted for, or was within the scope of the intention of either party in the preparation or execution of the lease. Is it not expressed as plain as need be, that the lessee may without risk "neglect" to operate the road, even although the franchise is affected, unless that operation is required, not by the contract, or the wish of the party, but by the order of the court requiring the same, "or conditioning thereon" some enjoyment or advantage to the lessor — events outside the contract? In that case the road is to be operated or damages paid, not under the contract for "use," but to save a penalty or forfeiture. Nor is any thing more claimed by the respondents? Referring to the lease, they say: It was executed to the plaintiff at a nominal rent, "the plaintiff agreeing to perform all the acts of the Albany Vermont Railroad Company in relation to such road which were required by law to be done, and the Albany Vermont Company agreeing that it would not regard an omission to operate the leased road as a breach of the conditions of the lease." What further is the contention in this respect of the respondents? As we find it in their printed points it is this: They say, "it agreed to operate it, substantially, if the courts should decide that its operation could not be lawfully discontinued. So far as the State and the public were concerned, it assumed all the duties of the Albany Vermont road, although the latter company agreed that it would not, in its private capacity, claim damages for not operating the road." It is evident that the object sought was the abandonment of so much of the line as was above Waterford Junction; and *Page 120 
whether this should be done directly, or by putting it under the control of the plaintiff, was the only question. In my opinion, that is not the kind of use the statute contemplated. The statute allows a "contract for use." The agreement, as I construe it, and apparently as the plaintiffs construe it, is not for the use of the railroad, but for its control, so that it shall not be used — not a contract for traffic upon it, but an agreement to prevent traffic. They do not say, we will use it; but if compelled to, we will use it. And such is the foundation of the argument of the respondents now. They say, the lessor "may at any time call upon the plaintiff to fulfill its covenant to operate the road, if
the law requires it." Moreover, as if to prevent any pretense on the lessees' part that they had by this instrument contracted for the right to use the roadway, the lessor not only reserves the right to abandon "the demised railroad or any part of it, in case it shall be or become requisite in order to protect the party of the first part or its lessees, the Rensselaer Saratoga Railroad Company, in the full enjoyment of that part of the railroad of said party of the first part" demised to them, reserves also a right to change the route or terminate the road for the same object, and it even reserves the right to do any of these things, although not requisite for the purpose named, without incurring any liability whatever to the plaintiff. Besides, its rights are subordinate to the obligation under which the lessor stood to the Rensselaer Saratoga railroad. That was to omit at its option the use of so much of the lessor's road as was not demised to them. It was entered into on the 12th day of June, 1860, and the learned trial court finds that the plaintiff removed the rails from the portion of the road leased to it in September and October, 1860. This was prior to the date of the lease; but that was the culmination only, as the court finds, of a series of negotiations; and it is evident the act of removal was by virtue of an arrangement included within its terms, and to carry out its object. To this add the fact that from that time, about seventeen years, the road has not only not been used by the lessees, plaintiffs here, but they have suffered it to remain subdivided and inclosed by fences and reduced by cultivation *Page 121 
by the farmers, to whom its several portions formerly belonged, or by their grantees, and we find that the interpretation given by us to the agreement or lease is also that of the parties. It contains no contract within the terms or meaning of the statute. The property is leased to the plaintiffs, in its language, "to have and to hold;" and looking, as we may, at the situation and relation of the contracting parties, and the situation and condition of the property affected by it, in order to get at the true construction of the agreement (Cannon v. Villars, L.R., 8 Ch. Div. 415), I can discover no intention that the lessees were to do more than this, viz.: "have and hold" the property as vacant and unused, nor that more than this is expressed. There is neither an undertaking to use nor a transfer of "the use" or right to use the road, but stipulations securing the abandonment of its use. Moreover, the statute authorizes a contract for "the use" of a railroad, meaning one capable of being used — not a road-bed capable of receiving rails. Such is its evident meaning.
In Wood v. B. B.R.R. Co. (8 Phila. [Pa.] 94) it is held that an act which empowers the leasing of a completed railroad will not authorize the transfer of the franchise for building a railroad. When the road now in question was leased, it was incomplete; intentionally made so. Whether we look, then, at the subject of the contract — incapable of use; or the terms of the contract — not providing for or contracting for its use, we find it is not within the object for which the corporation was organized, is not authorized by statute, and is void, and therefore unavailable as the foundation of an action.
But apart from this construction of the instrument is the question whether it, or the case made under it, in any view which can be taken, entitles the plaintiff to the interference of a court of equity. The statute of 1850 (supra, § 47) shows clearly enough that the policy of the State requires the speedy beginning of the construction of a railroad and its completion within a reasonable time thereafter. Unless, it says, within two years after its articles of association are filed, the company begins the construction of its road, and completes and puts it *Page 122 
in operation in five years thereafter, "its corporate existence and power shall cease." Note, it is to be finished and put in operation. This is due to the citizen, whose land has been taken for its construction, and to the public, whose necessities it was supposed required its taking. Here the road, although commenced and finished, has been dismantled, and for three times five years permitted to remain so. The plaintiff does not now pretend that it wants possession in order to restore its usefulness. It "was moved," the complaint says, "to enter into the lease by the anticipation that by the opening of new avenues of communication and the increase of its business therefrom, and other causes, its then line would become inadequate to the performance of its business, and the leased premises become available for operation in connection with its own line, and it then intended, has since intended," and now "intends, when occasion requires, to make use of the same for such purposes;" and such in substance is the finding of the trial court. Even if this allegation and this finding could be sustained upon the evidence, as we think it could not, it is needless to suggest that the land could not have been taken from the citizen for such a purpose. Shall a court of equity become a party to the transaction; by its decree put the plaintiff in possession of property, for which having no use, it substantially abandoned? If entitled to possession, what reason is there for passing by the legal action of ejectment? If any rights have been infringed, they are legal rights, and, for aught that appears, damages at law would give the plaintiff all the compensation it may fairly claim. It is argued that the injury caused by the defendant if unrestrained would be irreparable; but neither in the complaint or evidence, or finding of the court, does it appear how or why it would be so. The allegation of an apprehension is not enough; the facts must be stated, to show that it is well founded. The complaint seeks no damages, nor does it allege any. It is framed simply in furtherance of a suit in equity. The relief given goes beyond the special prayer of the complaint. It not only restrains the defendants "from interfering with or disturbing the possession of the plaintiffs *Page 123 
to" the premises in question, as the plaintiff prayed, but as we have seen, directs the surrender to the plaintiff of possession. But the defendants, by answer and by motion at the commencement of the trial, insisted that the complaint stated no ground for equitable relief. Upon this appeal they take the same position, and also argue that the case in evidence is no more to the purpose. The cause of action, if any thing, is a trespass; and that alone will not authorize the interference of a court of equity. Without going further back, we may recall with profit the words of KENT, Ch., in Jerome v. Ross (7 Johns. Ch. 315): "The objection to the injunction," he says, "in cases of private trespass, except under very special circumstances, is, that it would be productive of public inconvenience, by drawing cases of ordinary trespass within the cognizance of equity, and by calling forth, upon all occasions, its power to punish by attachment, fine, and imprisonment, for a further commission of trespass, instead of the more gentle common-law remedy by action, and the assessment of damages by a jury;" and conceding the undoubted right of every man to be protected in the possession and enjoyment of his property, enforces the opinion I have quoted by an illustration pertinent to the case before us. "He may have," he says, "on his land a large mound of useless stone or sand which he may not deem worth the expense of inclosing, and yet it would be a trespass for any person to remove any portion of the stone or sand without his consent; and he would be entitled to his action, even though the damages were nominal." "But would it be proper," he asks, "for this court to assume cognizance of such a trespass, and lay the interdict of an injunction upon it"? And answers: "I think not." The same answer should be made in this case. For any present practical use to the plaintiff, the strip of land protected by the injunction has been regarded as of no more value than the supposed mound of sand. Its rights were acquired earlier than 1862. Its first act, by itself or in conjunction with the Albany Northern railroad, was to remove so much of it as would have made its use possible; or if we discover its object by the lease, we find it then without rails *Page 124 
and disused; and in either case, it has permitted the territory so acquired to be converted for seventeen years to other than railroad use. Not deeming it worth the while by fences to preserve even the form and lines of a road, it has suffered others to destroy by their fences and mode of treatment for agricultural purposes all likeness to one. If the language of the statute (Laws of 1850, § 47, supra) does not, its evident spirit and policy does, apply to such a case. If a new road is required to be finished and put in operation within five years from its inception, as a condition of corporate existence, under what principle can a court of equity countenance by its judgment a substantial evasion of the terms of the statute? Its object is evident, to secure service to the public. And although its letter may be complied with, this object is defeated if after finishing and operating a road, its projectors disuse and abandon it. The court may not enforce operation, as was held in the case of the lessor (24 N.Y. 261, supra), nor can a court of equity declare a forfeiture of corporate rights; but it ought not by its decree recognize the right of the corporation to do that for which, as that case also holds, it has no privilege or franchise, or use its power in furtherance of an agreement which has nothing within its terms to commend it. In the case cited the court say: "The franchise can only be legally exercised by the corporation operating its entire road. There is no privilege granted or right obtained to operate a part thereof; and if it should undertake to do so, it is exercising a franchise or privilege without legal sanction." But while it is conceded that the forfeiture of corporate rights must be judicially ascertained and settled, and that corporate power which has been abandoned cannot be taken away but by regular process, yet it is also said in the case last cited that "there is nothing in the Railroad Act, nor power anywhere, to prevent a railroad corporation from abandoning its road and forfeiting its corporate privileges by non-user, if it chooses to do so." If, however, the corporation must still, as between itself and the State, be deemed in existence until the forfeiture has been judicially declared, it does not follow that a court of equity should co-operate *Page 125 
with it in the violation of its charter. The cause of forfeiture exists. The people only can institute proceedings to make it effective. In the meantime its legal rights, and those of its grantees, should be respected. But when, as we see here, the end and design of its existence have completely terminated, a court of equity should withhold its hand and leave those rights to be ascertained and settled by a court of law. Until that is done it is impossible to discover any which rest in equity. In point here is the case of The President, etc., v. The Trenton City B'dgeCo., (2 Beas. [N.J. Ch.] 46). It came before the court on motion for an injunction on bill and answer. The parties were bridge companies. The complainant claimed the exclusive franchise of having a bridge and taking tolls within a certain territory. The defendants were putting up a bridge within this territory, which, it was admitted, would divert a portion of the travel which then crossed at the old bridge. The answer alleged that, in violation of its charter, the bridge of the complainants had been converted to the purposes, and is constantly used for the transit of locomotives with trains of cars, and thus, for the purposes of ordinary travel, rendered inconvenient and insecure, and the rights of the public in the enjoyment of the bridge impaired. The court held that whether the complainants had violated their charter was a question solely for the cognizance of a court of law, and that for the purposes of the case it would be assumed that they had a right, in law and in consistency with their charter, to use their bridge for the purposes of a railroad; but say, "if by so doing the great purpose of their charter, the use of their bridge for the purposes of ordinary travel, is seriously impaired — if traveling by ordinary vehicles is rendered inconvenient, insecure and dangerous — if the convenience and benefit of the public, for whose advantage the franchise was granted, are sacrificed to the pecuniary interests of the corporation — the complainants do not stand in a position to ask the interposition of the extraordinary powers of a court of equity for their relief." The conclusion is reasonable. It accords with the general doctrine of equity, that an injunction will not be granted when it will *Page 126 
operate inequitably or contrary to the real justice of the case. The plaintiff in the case before us has less apparent right than in the one cited. Not only is travel interrupted, it is made impossible. It is as if the bridge had been removed, the proprietors retaining the franchise, as they do here. No equity can be found to sustain the claim of either. I have examined all the cases cited by the learned and zealous counsel for the plaintiffs to sustain the judgment. They are as follows: TheCity of New York v. Mapes (6 Johns. Ch. 46). The plaintiff claimed that it was about to take certain lands for the opening of a street; and although proceedings had been instituted, with notice to the defendants, they were about to erect upon the land a block of buildings, with a view of defeating the proposed improvement, by adding the value of the buildings to the expense thereof, and prayed an injunction against it. The prayer was denied, because the plaintiff "had shown no right or title, or raised an equity which can be a ground for an injunction." InThe N.Y. Print. Estab. v. Fitch (1 Pai. 97), the injunction asked for was denied, the court recognizing the general rule laid down in Livingston v. Livingston (6 Johns. Ch. 497), that while an injunction may issue to restrain trespasses, even when there is a legal remedy for the intrusion, "there must be something particular in the case to bring the injury under the head of quieting the possession, or to make out a case of irreparable mischief, or the value of the inheritance must be put in jeopardy by the continuance of the trespass;" but held the plaintiff's case not within it. It should also be observed that in Livingston v. Livingston the plaintiff's rights had been established in one action at law. In Akrill v. Seldon (1 Barb. 316), an injunction was denied, because it was considered well settled in this State that the court would not interfere to restrain a mere trespass, when the injury is not irreparable, and destructive of the plaintiff's estate, but is susceptible of pecuniary compensation, the court saying, in language applicable in both its branches to the present case, "Unless the injury will be irreparable, the court will leave the party to his remedy at law. There is the same reason why the *Page 127 
court should not interfere by restoring the party to possession; that is, that he has an adequate remedy at law." Hart v. TheMayor (3 Paige, 214) is to the same effect. In all these cases the remedy by injunction was denied. In Niagara Falls Int.Bridge Co. v. G.W.R.R. Co. (39 Barb. 224), it was granted to enforce an agreement, which, as the court said, made relation between the parties of the nature of a trust. These cases are followed by the text writers also cited by the respondent, viz.: (Story's Eq. Jur., §§ 925, 929, 930, and Willard, writing on the same subject p. 381.) Each lays down the general doctrine that equity interferes by injunction in order to prevent irreparable mischief, or to suppress a multiplicity of suits and vexatious litigations. Other cases are cited to show that ejectment will lie to recover possession of a street. Carpenter v. O. S.R.R. Co. (24 N.Y. 655); Wager v. Troy Un. R.R. (25 id. 526); and Williams v. N.Y.C.R.R. (16 id. 97), where damages and equitable relief were both sought; and to these may be added the same case, under the name of Henderson v. Same (78 N.Y. 423), where the relief sought was given. That ejectment will lie in such a case might be conceded; but the Williams Case seems to have no application for the facts here are not sufficient to lay the foundation for equitable relief, or to take the case from out the general rule above referred to. They show that interference by injunction is not the fit and appropriate mode of redress, under the circumstances of the case. (Story's Eq. Jur., § 959.) And although the form of actions and suits, and the distinction between actions at law and suits in equity has been abolished, a party, to entitle himself to the equitable remedy by injunction, must still make such a case as would, while the distinction existed, have made an equitable cause of action. This is well settled. (N.Y. Life Ins. Co. v. Supervisors of N.Y.,
4 Duer, 192; Pumpelly v. Village of Owego [Ct. of App.], How. Pr., vol. 45, pp. 259, 260; Heywood v. City of Buffalo,14 N.Y. 534; Albany Northern R.R. v. Brownell, 24 id. 348.) Such a case has not been made here. The complaint and proof is of a trespass, but there is neither allegation nor *Page 128 
proof of facts showing the injury to be irreparable. There is no allegation showing multiplicity of suits pending or expected, and while there is a finding by the court that a remedy can only be partially obtained by a great multiplicity of actions at law, there is no evidence that any such action has been tried or even brought. This the general rule requires, and we find nothing in the case to make it an exception. Against whom will the suits be required? If against the defendant, it will be time to urge that plea when by one action the plaintiff's legal right shall have been established, and its adversary still offends. For aught that now appears, one action at law will suffice. If against those who resumed possession of the lands, and under whom the plaintiff claims, they are not parties here.
A point of less importance, but bearing upon those questions already considered, relates to so much of the road-bed as was not conveyed to the Northern Railroad Company or its successors, or acquired by them. The quantity is not infinitesimal or beneath the attention of a court. It embraces parcels of land owned and in possession of many different persons, and is assumed by the respondent to be in all "a few hundred feet of the road-bed." It is found indeed that the companies occupied and operated their road thereon "until the operation of the same was discontinued in 1859." But it also appears in regard to some parcels, that soon after that event, and before the execution of the lease, the former owners re-entered and have since occupied, until by their consent the defendant took possession. The respondent claims that as to these, a grant, although not proved, should be presumed. No reason or authority for this position is given. If the plaintiff, or its grantor, had possession from 1853 to 1859, the defendants and those from whom they claim, the former owners and now owners of record, have had peaceful and uninterrupted possession for a much longer period, putting the land to uses inconsistent with the plaintiff's assumed rights. As to these parcels the plaintiff has shown no legal or equitable right.
Some other questions are presented for our consideration: *Page 129 
(1) The effect of the amendment by the Albany Vermont Railroad Company of its articles of association. The amendment was filed in the office of the secretary of State February 9, 1878. If valid, its effect was to discontinue its line at the Waterford Junction, and so cut off that portion embraced in the plaintiff's lease. The appellants claim that this proceeding was warranted by statute. (Laws of 1854, chap. 282, § 13.) It seems to me otherwise. The line is the route of the road, and when adopted, designates its location. (Act of 1850, supra, § 14.) It necessarily includes the places from and to which the road is to be constructed. The Albany Vermont railroad terminated at Albany and Eagle Bridge; the Rensselaer Saratoga railroad at Troy and Saratoga; and the Troy Boston railroad at Troy and the line of the State of Vermont. These conditions do not bring the case within the first clause of the section cited, for the obvious reason that the location of the line of the Albany 
Vermont railroad is not the same as that of either of the others. Is it within the alternative clause, "or whenever by the connection of two or more railroads the same points of termination are reached by railroad communication * * * any road so connecting may alter and amend its articles of association so as to terminate at the point of intersection?" It is conceded that the Rensselaer Saratoga railroad and the Albany Vermont railroad do intersect each other at Waterford Junction; but the same reason which leaves them outside the meaning of the first clause applies here. There is no common location of line, nor are the same points of termination reached. The statute also contemplates an agreement between the connecting roads for the construction by one of them of so much of the line as is common to both roads. And if we apply it to a road already constructed, and extend the meaning so as to take in the maintenance of such a road, we find none here. But notwithstanding our construction that the statute does not apply, we think the plaintiff is not in a position to avail itself of the objection. The plaintiff's right of action depends upon the contract between the plaintiff and the Albany Vermont Railroad Company. *Page 130 
It is one of the stipulations of that contract, a right reserved to the Albany Vermont Railroad Company, to terminate its line just where it has undertaken to terminate it by the amendment referred to. Not only in case such termination shall be necessary to protect the Rensselaer Saratoga Railroad Company in the enjoyment of privileges conferred upon it, but, in the language of the lease under which the plaintiff claims, and which it now seeks to enforce, "It is agreed that in case the party of the first part shall exercise, or assume, or undertake to exercise the said rights as reserved, or either or any thereof (that is, to abandon so much of the line as was demised to the plaintiff, or to terminate it at its intersection with the Rensselaer 
Saratoga railroad) without the same being requisite to protect the party of the first part, as aforesaid, the said party of the first part shall not thereby incur any liability whatsoever to the said party of the second part." A court of equity will not by injunction protect a naked legal right, which the complainant and those under whom he claims have covenanted not to exercise. (Bosley v. McKim, 7 H. J. 468.) The effect of the stipulation I have quoted is to limit the plaintiff's rights, and subject them to the action of the lessor. It is as if the lessor had written, I reserve the right, and you can have and hold until I abandon or terminate the line. Thus the lease is qualified, and the lessee cannot question the power of the lessor to withdraw the privilege granted. That is the effect of its amendment, as between the parties to the lease. Now, although the public have a right to say the line is not shortened, the plaintiff, having consented to the act of its lessor, cannot stand in the place of the public and deny its validity. The question is on the lease and the rights of the parties thereto under it. The right to terminate the line is in substance a right to modify or terminate the lease to that extent, or to withdraw the disused road from its operation. It is the result of a contract; and we find there the consent of both parties. The plaintiff can claim nothing against the exercise of this right, for with or without reason, the lessee agrees that no liability whatsoever shall be incurred *Page 131 
by the lessor for its exercise. In face of this agreement there can be no foundation on which to rest an appeal to a court of equity. The ground of the jurisdiction of that court is the inadequacy of the remedy at law. When that remedy, and even any claim for liability, is disavowed by the party, of course the ground is taken away.
It seems unnecessary to inquire in regard to the validity of the judgment of the Supreme Court, which by its terms relieved The Albany Vermont Railroad Company of its obligations under its charter in respect to that portion of its road so leased to the plaintiff. The plaintiff here was not a party to the action in which it was rendered. Before trial the Special Term directed it to be brought in as defendant, and although its order was reversed by the General Term, it was affirmed here. (77 N.Y. 232. ) The rights of the parties to the record could not be settled until those of the plaintiff had been determined, and they could not be in its absence. (Code of Civil Procedure, § 452; 77 N.Y., supra.)
Other questions are presented by the appellant upon which no opinion need be expressed, as those already considered have been so answered as to make it necessary to reverse the judgment. And as there is no aspect in which the case can be sustained, the complaint should also be dismissed.
Judgment reversed and judgment ordered that the complaint be dismissed, with costs.
All concur, except MILLER, J., not voting, and RAPALLO, J., absent at argument; FOLGER, Ch. J., concurs in result.
Judgment reversed.